# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Lomax*, 2012 IL App (1st) 103016

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. MARIO LOMAX, Defendant-Appellee. |
| District & No. | First District, Sixth Division<br>Docket No. 1-10-3016 |
| Filed<br>Rehearing denied | June 29, 2012<br>August 7, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The grant of defendant's motion to quash his arrest and suppress evidence was reversed where the warrantless entry of defendant's residence was justified under the emergency aid exception to the warrant requirement based on multiple 911 calls about shots fired at a particular location and the reasonable belief that there was an emergency at that location |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-8588; the Hon. Marcus Salone, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on Appeal

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Janet C. Mahoney, and Nancy Colletti, Assistant State's Attorneys, of counsel), for the People.

Abishi C. Cunningham, Jr., Public Defender, of Chicago (Harold J. Winston, Assistant Public Defender, of counsel), for appellee.

Panel

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.

Justice Lampkin concurred in the judgment and opinion.

Justice Garcia dissented, with opinion.

**OPINION**

¶ 1    After being charged with eight counts of unlawful use of a weapon by a felon and one count of being an armed habitual criminal, defendant Mario Lomax (defendant) filed motions to quash the arrest and suppress evidence claiming that the police did not have the authority to enter and search his home without a warrant. After the suppression hearing, the court granted defendant's motions. The State filed a motion to reconsider, which it later supplemented, and the court denied the State's motion. The State appeals. We reverse.

¶ 2                              BACKGROUND

¶ 3    On May 7, 2009, the State charged defendant with eight counts of unlawful use of a weapon by a felon, pursuant to section 24-1.1 of the Criminal Code of 1961 (720 ILCS 5/24-1.1(A), (E) (West 2008)) and one count of being an armed habitual criminal, pursuant to section 24-1.7(a) (720 ILCS 5/24-1.7(a) (West 2008)). Defendant subsequently filed motions to quash arrest and suppress evidence on October 22, 2009, arguing that his right to protection from unlawful searches and seizures, pursuant to the fourth amendment of the United States Constitution and article I, section 6, of the Illinois Constitution, had been violated. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. The court held a suppression hearing on June 29, 2010, at which Chicago police officer Andrew Thomas gave the following testimony.

¶ 4                        I. Officer Thomas's Testimony

¶ 5    Officer Thomas testified that, on April 25, 2009, he and his partner were directed to a "two flat multiunit" building on South Wells Street in response to multiple calls to 911 from citizens claiming that gunshots had been heard. Officer Thomas testified that his incident report did not state whether the 911 calls had provided a specific unit number at the South

Wells address, but he testified that the calls had specifically stated that the shots had been fired in and around the "first floor rear" unit of the building. Officer Thomas testified that the calls stated that people had heard shots fired both inside and outside of the first-floor rear unit and that a door to the first-floor rear unit had been loudly slammed. The officer further testified that none of the calls had identified a shooter. Officer Thomas testified that the 911 dispatcher continued receiving calls after Officer Thomas and his partner began driving toward the South Wells Street address. Officer Thomas testified that he and his partner tried to arrive at the building as quickly as possible and that they arrived at the building within two to three minutes after receiving the first dispatch call. Officer Thomas described this as a fairly quick response time. Officer Thomas testified that he and his partner were concerned about the serious nature of the calls and that they knew that they needed to arrive at the address as quickly as possible because people might be hurt or in danger.

¶ 6    Officer Thomas testified that, upon arriving at the building, he and his partner approached the door to defendant's apartment, which was the "first floor rear" unit, and he knocked and announced that he and his partner were Chicago police officers. A child between the ages of two to four answered the door, and the officers observed an area inside the apartment. Officer Thomas testified that he observed two adult women and three small children. When asked about the children's ages, Officer Thomas testified that he could not determine exactly how old they were, but speculated that they were most likely between the ages of two to four.

¶ 7    Officer Thomas testified that he told the five individuals to exit the apartment without asking them any questions. Immediately after they exited, Officer Thomas observed defendant and told him to exit the apartment. Officer Thomas testified that he told the occupants to exit the apartment because of the serious nature of the call. Officer Thomas did not observe anyone inside the apartment who was in distress, injured, or in need of medical attention and did not observe any contraband. Officer Thomas and his partner entered the apartment to perform a "visual safety check" to ensure that no one had been shot. There is no issue that the subject apartment belonged to defendant.

¶ 8    The officers searched the bedrooms, bathroom, and main room of the apartment. Officer Thomas testified that in his search of one of the bedrooms, he observed body armor, a pistol holster, pistol belt, and pistol ammunition. Officer Thomas testified that his partner told him that he observed a pistol in the main room of the apartment. Defendant was then taken into custody as the officers conducted a search of the outside of the building. Officer Thomas testified that he observed four spent shell casings on the ground outside of defendant's apartment.

¶ 9    Officer Thomas admitted that he and his partner did not have a warrant to search the apartment and did not receive consent to enter or search the apartment. Officer Thomas testified that he ordered the occupants to exit the apartment and then conducted a search without a warrant because of the serious nature of the 911 calls. He testified that he was worried that someone inside may have been shot and in need of aid. He testified that he conducted the search pursuant to public safety concerns, and that because the police department had received numerous calls complaining of shots fired, he was concerned that someone was hurt.

¶ 10    The trial court granted defendant's motions to suppress evidence and quash the arrest. The trial court found that the officers failed to ask the occupants any questions about whether they had made the 911 calls or if anything was wrong before entering the apartment. The trial court further found that the entry was improper because the officers did not receive consent to enter from any occupant, nor did they immediately observe any evidence that an emergency was in progress or that anyone was in distress. The trial court stated that multiple calls to 911 were not enough to allow police officers to conduct warrantless searches of drawers and crawl spaces. The trial court further stated: "So the officer says he responds to a call of shots fired. Maybe it's a legitimate call, maybe not. There are a number of calls that talk about reports coming from [the address]. At least one of them is more specific according to the Officer's testimony. One takes him directly to the apartment in which the defendant is located. Based upon this number of calls, it's now okay for the police to go through your underwear drawer. Let's search. Who knows. Because we have got this call. *** And maybe somebody is in the crawl space." Later, at the reconsideration hearings, the prosecutor offered to proffer that, if Officer Thomas were called to testify, he would testify that he and his partner did not search through drawers or crawl spaces. The trial court further found that the children, at most, acquiesced to the officers' command to exit the apartment. The trial court concluded that the officers' actions did not appropriately meet the balance of interests required to allow a warrantless entry and search, in light of the factual situation presented in the case.

¶ 11                              II. Reconsideration Hearings

¶ 12    On July 26, 2010, a hearing was held, and the State requested leave to file a motion to reconsider the court's rulings on the motions to quash the arrest and suppress evidence. The trial court found that the police had no basis for selecting defendant's apartment based upon the evidence provided at the suppression hearing, because Officer Thomas and the parties had described the building as "multiunit." Based upon the use of that term, the trial court concluded that it had been led to believe that the building contained at least 12 units.[1] The trial court reviewed the hearing transcript and concluded the police had no reason for selecting the first-floor rear apartment based on Officer Thomas's description of the building. The trial court did not address the fact that Officer Thomas testified that callers had identified the first-floor rear unit as the location of the complained of gunshots.

¶ 13    In response, the State produced a photograph purportedly of the building to show that the police were justified in determining that defendant's apartment was the one referred to as the "first floor rear" unit in the 911 calls. Upon viewing the photograph, the trial court admitted that the building's layout was different than it had been led to believe based on Officer Thomas's testimony. The trial court criticized the use of the term "multiunit" by Officer Thomas and stated that Officer Thomas should have used the term "two-flat" without adding "multiunit." The trial court stated that knowing the building's layout made a "world of difference" to its decision regarding the officers' selection of defendant's apartment.

_____

[1]As we noted, Officer Thomas testified that the building was a "two flat multiunit" building.

However, the trial court pointed out that the photograph was not in evidence and could not be considered in the motion for reconsideration.

¶ 14    The State filed its motion after the hearing, and on August 20, 2010, the State filed a supplemental motion to reconsider. Both the State's original and supplemental motions to reconsider were predicated on the emergency aid exception to the warrant requirement of the fourth amendment to the United States Constitution and article 1, section 6 of the Illinois Constitution. On August 23, 2010, the State argued its motion to reconsider, claiming that the emergency aid exception applied to the search in this case. The State argued that the 911 calls provided a sufficient, objective belief that an emergency was in progress, necessitating immediate police response, and that the unit where the emergency existed was the first-floor rear unit that belonged to defendant. The State argued that the emergency aid exception exists because if immediate police action will prevent injury or death to citizens, that consideration will outweigh the "inconvenience" of warrantless police entry into a residence. The State argued that Officer Thomas and his partner were justified in believing that their entry into defendant's residence was necessary to prevent injury or death. The State further argued that the officers only conducted a plain view search of the apartment and that the officers did not look in any drawers, crawl spaces, or other closed-off locations, and that everything in plain view is admissible under the emergency aid exception. The State offered to proffer that, if Officer Thomas were called to testify at trial, he would testify that neither he nor his partner opened any drawers or crawl space doors.

¶ 15    The trial court found that the testimony of Officer Thomas was inconclusive about why he and his partner chose to only investigate defendant's apartment to the exclusion of the other apartments. The trial court therefore found no "objective basis" for the police to select defendant's apartment and denied the State's motion. The trial court found that an objective basis could have been established simply by asking the occupants questions before ordering them to vacate the apartment. The trial court further found that, although it appreciated the need for the police to act promptly when responding to 911 calls, allowing the police to conduct a warrantless search of a dwelling based upon the information available to the officers in this case would not be "good law." The trial court also doubted whether a response time of two to three minutes could be considered "prompt." The State appeals.

¶ 16                                    ANALYSIS

¶ 17    On appeal, the State claims that the officers' actions were justified by the emergency aid exception to the warrant requirement and that the trial judge made improper findings of fact.

¶ 18                              I. Standard of Review

¶ 19    In reviewing a trial court's ruling on motions to suppress evidence and quash arrest, a reviewing court must consider questions of both law and fact. *People v. Jones*, 215 Ill. 2d 261, 267 (2005). Findings of historical fact may only be overturned if such findings run counter to the "manifest weight of the evidence." *Jones*, 215 Ill. 2d at 268. "A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence." *Bazydlo v.*

*Volant*, 164 Ill. 2d 207, 215 (1995). This deferential standard of review exists because the trial court is in a superior position to determine and weigh the credibility of the witnesses, observe witnesses' demeanor, and resolve conflicts in their testimony. *Jones*, 215 Ill. 2d at 268. The reviewing court is free to make its own assessment of the facts when drawing legal conclusions on the issues presented. *Jones*, 215 Ill. 2d at 268. Therefore, this court reviews *de novo* the ultimate question of whether or not the motions to quash arrest and suppress evidence should have been granted. *Jones*, 215 Ill. 2d at 268. *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 20                              II. The Trial Court's Factual Findings

¶ 21    The State argues that certain factual findings by the trial court run contrary to the manifest weight of the evidence and must be reversed. Specifically, the State argues that the trial court based its decision in part on the belief that the police officers searched through drawers and crawl spaces at defendant's apartment and that the police had no reason to select defendant's apartment as the source of the gunshots.

¶ 22    At the suppression hearing, the trial court remarked that at least one of the 911 calls led Officer Thomas "directly to the apartment in which the defendant is located." Months later, at the hearing during which the State petitioned for leave to file its motion to reconsider, the trial court found that it had "failed to hear any objective basis for concluding that the call for service was directed to the apartment that the officer directed the occupants out of." The court did not reconcile this finding with its previous statement that Officer Thomas testified that at least one call directed them to defendant's apartment; the court did not find the officer's testimony unreliable nor did it acknowledge its previous finding.

¶ 23    At the suppression hearing, the trial court restated the facts of the case and included a statement that the police went through drawers and looked in crawl spaces when there is nothing in the record to support this finding. Nothing in the record suggests that the police officers did anything more than perform a plain view safety search. There is no evidence in the record that the police opened up any drawers or crawl spaces. The record is not very informative about the extent of the officers' search, but the only indication in the record that suggests drawers and crawl spaces had been searched comes from the trial court's erroneous factual findings. Neither party ever argued that anything beyond a plain view search had occurred. The trial court had no reason to rely on a finding of fact that the court assumed without evidentiary support. See *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 507-08 (2007) (finding that the trial court's conclusions regarding the credibility of an expert witness were against the manifest weight of the evidence because the witness' conclusions were not based upon "relevant, material evidence that was key under the circumstances of the case" (internal quotation marks omitted)).

¶ 24    The dissent finds that the trial court's statement at the first hearing about going through drawers and crawl spaces was nothing more than a hypothetical statement. *Infra* ¶ 90. However, at the reconsideration hearing, the prosecutor offered to proffer that Officer Thomas, if called to testify, would specifically deny searching through drawers and crawl

-6-

spaces because the State believed that the trial court did rely on such a finding. In effect, the prosecutor was attempting to correct an erroneous factual finding. There was no reason for a proffer to correct a hypothetical. In addition, the record indicates that the trial court misunderstood the layout of the South Wells building and how Officer Thomas was directed to the first-floor rear apartment. A reasonable person could conclude that the trial court misunderstood other parts of Officer Thomas' testimony as well.

¶ 25    For these reasons, we find that the trial court's factual findings were against the manifest weight of the evidence and we will review the denial of the motions *de novo*.

¶ 26                    III. The Emergency Aid Exception

¶ 27    The fourth amendment to the United States Constitution secures the right of citizens to be "secure in their persons, houses, papers, and effects against *unreasonable* searches and seizures." (Emphasis added.) U.S. Const., amend. IV; see also *Elkins v. United States*, 364 U.S. 206, 213 (1960) (holding that the fourth amendment applies to state officials through the fourteenth amendment). The central requirement of fourth amendment analysis is reasonableness. *Illinois v. McArthur*, 531 U.S. 326, 330 (2001). Specifically, courts must examine whether the totality of the circumstances surrounding the particular invasion of the citizen's person or property was reasonable. *Jones*, 215 Ill. 2d at 268. The United States Supreme Court has held that the fourth amendment establishes "rules and presumptions designed to control conduct of law enforcement officers" which may violate citizens' rights against improper search and seizure. *Jones*, 215 Ill. 2d at 269 (quoting *McArthur*, 531 U.S. at 330).

¶ 28    Generally, a search is unreasonable if it is not done pursuant to a warrant supported by probable cause. *Jones*, 215 Ill. 2d at 268. However, exceptions to the warrant requirement exist, and the totality of circumstances can render a warrantless search reasonable under the fourth amendment. *McArthur*, 531 U.S. at 330. When determining whether a warrantless search is reasonable, courts must balance the legitimate promotion of government interests against the intrusion of fourth amendment principles. *Jones*, 215 Ill. 2d at 269; *People v. Ramos*, 353 Ill. App. 3d 133, 148 (2004). See also *United States v. Knights*, 534 U.S. 112, 121 (2001) (holding that lower standards than those normally required by the fourth amendment are allowed when the balancing of government and private interests makes such lessened standards reasonable).

¶ 29    One example of a search for which a warrant is not required is a search made pursuant to the emergency aid exception, which allows police to enter and search a home without a warrant in emergency situations. *United States v. Venters*, 539 F.3d 801, 806-07 (7th Cir. 2008). The Illinois Appellate Court for the Second Judicial District has used a two-step[2] test

---

[2]The test, as created by *People v. Griffin*, 158 Ill. App. 3d 46 (1987), initially utilized a three-prong test, but the third prong, stating that the search must not be primarily motivated by an intent to arrest and seize property, was found irrelevant in determining whether a seizure violated the fourth amendment. *Brigham City, Utah v. Stewart*, 547 U.S. 398, 404 (2006) (holding that the United States Supreme Court's previous cases " 'make clear' that 'the subjective motivations of the

for determining whether the exception applies. *People v. Ferral*, 397 Ill. App. 3d 697, 705 (2009) (citing *People v. Griffin*, 158 Ill. App. 3d 46, 50-51 (1987)). First, the police must have "reasonable grounds" to believe there is an emergency at hand; and second, the police must have some reasonable basis, "approximating probable cause," associating the emergency with the area to be searched or entered. *Ferral*, 397 Ill. App. 3d at 705 (citing *Griffin*, 158 Ill. App. 3d at 50-51). The reasonableness of the officers' beliefs as to the existence of an emergency is determined by the totality of the circumstances known to the officer at the time of entry. *Ferral*, 397 Ill. App. 3d at 705 (citing *Griffin*, 158 Ill. App. 3d at 51). The United States Supreme Court has held that emergency situations include instances when someone may be injured or threatened with injury. See *Michigan v. Fisher*, ___ U.S. ___, 130 S. Ct. 546, 548 (2009) (*per curiam*) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943, 1947 (2006)).

¶ 30          A. Reasonable Grounds to Believe an Emergency Exists

¶ 31     In this case, the police certainly meet the "reasonable grounds to believe an emergency exists" prong of the test. The officers had been notified of multiple calls to 911 complaining of "shots fired" in an apartment at the South Wells building. "A 911 call is one of the most common–and universally recognized–means through which the police and other emergency personnel learn that there is someone in a dangerous situation who urgently needs help." *United States v. Richardson*, 208 F.3d 626, 630 (7th Cir. 2000). The defendant in *Richardson* argued that a 911 call, by itself, cannot justify the emergency aid exception to the warrant requirement, because 911 calls may be fraudulent or unreliable. *Richardson*, 208 F.3d at 629-30. However, the court found that this argument was too broad, because of the importance of 911 calls in alerting police to real emergencies. *Richardson*, 208 F.3d at 630. The court held that it would not "exclude the possibility of a case in which it would be objectively unreasonable for a police officer to rely on a 911 call" to create the objective belief that an emergency exists; but based upon the facts in the record, the court concluded that the police were justified in entering the defendant's home. *Richardson*, 208 F.3d at 631. Here the 911 calls were many and one even designated the unit as the first "first floor rear" unit when there were only two units on the first floor.

¶ 32     In *United States v. Elder*, the United States Court of Appeals for the Seventh Circuit held that a warrantless search made pursuant to an anonymous 911 call was reasonable under the fourth amendment. *United States v. Elder*, 466 F.3d 1090 (7th Cir. 2006). In *Elder*, an unidentified man dialed 911 and told the police that he believed he was observing people involved with methamphetamine production or distribution. *Elder*, 466 F.3d at 1090. The caller never identified himself or the suspected perpetrators, and he hung up abruptly. *Elder*, 466 F.3d at 1090. When officers arrived at the caller's address, they observed that the lights

individual officers ... ha[ve] no bearing on whether a particular seizure is 'unreasonable' under the *Fourth Amendment*' " (emphasis added) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). See also *People v. Ferral*, 397 Ill. App. 3d 697, 705 n.3 (2009) (holding that Illinois courts have expressly followed *Brigham City*'s rejection of the subjective prong).

and the television were on by looking through the window, but no one answered when they knocked on the door. *Elder*, 466 F.3d at 1090. The Seventh Circuit held that the police could not have known whether the caller was in danger or injured unless they entered the home to perform an investigation. *Elder*, 466 F.3d at 1090-91. The court held that the belief that the caller was injured or in danger was reasonable because violence associated with the drug trade "created a possibility that violence had been done" or that the caller was being held hostage at gun- or knife-point. *Elder*, 466 F.3d at 1091. The court found that the totality of these circumstances was enough to create a reasonable belief that an emergency existed, allowing for a warrantless search. *Elder*, 466 F.3d at 1091.

¶ 33    Defendant cites *People v. Feddor* to argue that, because no one observed any injuries prior to the police entering the apartment, the police could not have had a reasonable belief that an emergency existed. *People v. Feddor*, 355 Ill. App. 3d 325 (2005). However, the nature of the emergency at issue in *Feddor* is much different than that present in the case before this court. In *Feddor*, the police received a call informing them of a motor vehicle accident and that one of the vehicles had fled the scene. *Feddor*, 355 Ill. App. 3d at 327. The caller had followed the vehicle and reported that the driver, who was identified as the defendant, returned to his home located one-quarter of a mile from the accident site and pulled into his garage and closed the door. *Feddor*, 355 Ill. App. 3d at 327. The witness reported that the vehicle was badly damaged and that the driver had been "hanging out of the vehicle" as he was driving. *Feddor*, 355 Ill. App. 3d at 327. The police arrived at the driver's house, rang the doorbell, and received no answer. *Feddor*, 355 Ill. App. 3d at 327. The police waited 10 minutes for a third officer to arrive, then after conferring with that officer, called the fire department. *Feddor*, 355 Ill. App. 3d at 327. When a fire truck and ambulance arrived, the police forcibly entered the residence and arrested the driver for driving under the influence of alcohol. *Feddor*, 355 Ill. App. 3d at 327.

¶ 34    The court in *Feddor* found that the facts did not support a reasonable belief that an emergency existed. *Feddor*, 355 Ill. App. 3d at 331. The court summarized the facts known to the police as follows: the police knew that the defendant had been in an accident, that he had driven himself home, that the caller had not noticed anything physically wrong with the defendant, and that the defendant did not answer his door. *Feddor*, 355 Ill. App. 3d at 331. Based upon these facts, the court concluded that the police could not reasonably believe an emergency was occurring. *Feddor*, 355 Ill. App. 3d at 327. Nothing would reasonably suggest to the police that the defendant required immediate aid to "safeguard his [physical] well-being." *Feddor*, 355 Ill. App. 3d at 327.

¶ 35    Further, the police officers waited for 10 minutes at defendant's home before requesting aid from the fire department. *Feddor*, 355 Ill. App. 3d at 327. This fact strongly suggests that the police did not believe an emergency situation existed; it is reasonable to conclude that the fire department was called because of the probability of their need after the police broke into defendant's home. See *People v. Koester*, 341 Ill. App. 3d 870, 875 (2003) (holding that because the police officers waited for half an hour before entering the defendant's residence, their testimony that they believed an emergency situation existed was placed into doubt). Although the standard is objective, rather than subjective, the fact that the police waited indicates that the officers did not have a belief, objective or subjective, that they were

responding to an emergency situation. In an emergency, some person is in need of immediate aid. *Feddor*, 355 Ill. App. 3d at 331. Waiting 10 minutes undermines the purpose of the emergency aid exception because in that time, the emergency could pass.

¶ 36    In contrast, the police in the case at bar had been informed of multiple calls to 911 complaining that gunshots had been fired in an apartment at the South Wells building. One of the calls had specified that the shots came from the first-floor rear unit. Although the police had no specific details about the identity or appearance of either the shooter or any potential victim, the probability that someone had been shot was sufficient to create a reasonable belief that an emergency existed. The police responded to the facts available to them, which led them to reasonably infer that an emergency was in progress. In addition, the police in this case responded immediately. Unlike in *Feddor* or *Koester*, the police arrived at the building as quickly as possible and immediately entered defendant's home shortly thereafter.

¶ 37    Defendant's use of *Feddor* to argue that the amount of facts known to police determines the reasonableness of the belief of the existence of an emergency misconstrues the case's holding. *Feddor*, 355 Ill. App. 3d at 331 (holding that the totality of the facts presented in the case did not support the finding of an emergency situation). The number of facts available to the police is important; however, each case is decided by the totality of its own unique facts. *Feddor*, 355 Ill. App. 3d at 331-32. Contrast *Feddor*, in which the police received a plethora of facts from a witness who had called 911, with *Hanson v. Dane County*, in which the only facts known to the police were that a 911 call had been made, but before the caller could say anything, the line went dead, and all attempts by the 911 dispatcher to reestablish contact with the caller were unsuccessful. *Hanson v. Dane County*, 608 F.3d 335, 337 (7th Cir. 2010). In *Hanson*, police officers arrived at the location where the call was made, entered the residence without permission, and questioned the four occupants. *Hanson*, 608 F.3d at 337. The police learned that the caller had been attacked by her husband and proceeded to arrest the husband. *Hanson*, 608 F.3d at 337. However, the caller refused to press charges and the case was dismissed. *Hanson*, 608 F.3d at 337. The attacker proceeded to sue the county for violation of his fourth amendment rights, but the United States Court of Appeals for the Seventh Circuit found that the warrantless entry fell under the emergency aid exception. *Hanson*, 608 F.3d at 337-38.

¶ 38    The court reasoned that because the lack of an answer to a dispatcher's attempts to return a 911 call implies that the caller is unable to pick up the phone, which is often due to injury, threat of violence, or a medical emergency, the 911 call provided the officers with probable cause to enter the residence. *Hanson*, 608 F.3d at 337. The court found that other reasons for a caller failing to respond exist, such as a child dialing 911 by accident or someone calling 911 on a cellular phone that had been set to "silent," and who thus did not realize that the dispatcher was attempting to call back, but concluded that an unanswered return call is sufficient to create the reasonable belief that an emergency situation exists. *Hanson*, 608 F.3d at 337-38. Clearly, the number of facts known to police may be important, but it is the content of the facts that is most important.

¶ 39    Multiple calls to 911 complaining that people overheard gunshots being fired created a reasonable belief that an emergency situation existed at the first-floor rear unit of the South

Wells building and that someone was in need of aid. Defendant's arguments to the contrary, which are that the police could not be sure whether or not the sounds were in fact gunshots and that none of the calls were made by anyone who had physically observed a gun, if accepted, would frustrate the purpose of the 911 emergency system. As the Seventh Circuit found in *Hanson*, multiple reasons exist as to why no one who had observed a gun had called 911. *Hanson*, 608 F.3d at 337. If someone had been shot and was in need of medical attention, he or she might not be able to operate a phone. *Hanson*, 608 F.3d at 337. Furthermore, anyone else in the apartment might have been afraid to call 911 because of threats of physical violence from the person holding the gun. *Hanson*, 608 F.3d at 337.

¶ 40    The reasonableness prong of the test is determined by the totality of the circumstances known to the officer at the time of entry. *Ferral*, 397 Ill. App. 3d at 705 (citing *Griffin*, 158 Ill. App. 3d at 51). The United States Supreme Court has cautioned courts against second-guessing the police's assessment of the situation. *Ryburn v. Huff*, ___ U.S. ___, ___, 132 S. Ct. 987, 992 (2012) (*per curiam*). Police officers often must make split-second decisions, without the benefit of immediate hindsight, in situations that are often " 'tense, uncertain, and rapidly evolving.' " *Ryburn*, ___ U.S. at ___, 132 S. Ct. at 992 (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)).

¶ 41    The dissent finds that the officers' belief that an emergency existed was not objectively reasonable because the officers did not see anyone injured from their vantage point from outside the apartment, nor did they see physical evidence of a disturbance until after they entered the apartment. *Infra* ¶ 88.

¶ 42    In support, the dissent cites to *People v. Mario T.*, 376 Ill. App. 3d 468 (2007). *Infra* ¶ 100. In *Mario T.*, the police received a call stating that three males were breaking into a vacant unit on the second floor of a building. *Mario T.*, 376 Ill. App. 3d at 469. Upon arriving at the second floor of the building, the responding officers observed four males "loitering" in the hallway. *Mario T.*, 376 Ill. App. 3d at 469. One of the responding officers observed the four males for "a 'few seconds' " then decided to conduct field interviews to determine whether they lived in the building. *Mario T.*, 376 Ill. App. 3d at 469. When the officer learned that the males did not live in the building, she patted the defendant down to determine whether he was armed. *Mario T.*, 376 Ill. App. 3d at 469. The officer claimed that she feared for her safety because the building was known as an area of high drug and gang activity, and her experience as a police officer taught her that people involved with drugs and gangs were often armed. *Mario T.*, 376 Ill. App. 3d at 469. This court noted that there was nothing in the record to indicate that the police observed whether any apartment doors were ajar or showed damage indicative of a break-in. *Mario T.*, 376 Ill. App. 3d at 474. This court ultimately concluded in *Mario T.* that the police's lack of an investigation into whether the calls were legitimate strongly indicated that the stop and frisk was improper. *Mario T.*, 376 Ill. App. 3d at 476.

¶ 43    The facts presented in the case at bar are distinguishable from the facts in *Mario T.* Here, the calls reported that the shots were heard from a specific apartment. Thus, the officers would not be able to corroborate the facts of the 911 calls until they were inside the apartment. This was truly an emergency aid exception to the warrantless search. See *Elder*, 466 F.3d at 1090-91 (holding that police officers could not have known whether a caller to

-11-

911, who complained of methamphetamine at an address and hung up abruptly, was safe until after they entered the residence located at the address). Unlike a break-in, which would show signs of damage to the door of the broken-into apartment, if someone had been shot inside defendant's apartment, the police could not know the extent of the emergency until they had conducted a search inside the apartment. *Mario T.*, 376 Ill. App. 3d at 474; *Elder*, 466 F.3d at 1090-91. To hold that the police could not enter an apartment to search for gunshot victims when multiple 911 calls informed them that gunshots had been heard *inside* the apartment would undermine the purpose of the 911 system and unreasonably delay medical attention to people in need of immediate assistance.

¶ 44    The dissent cites to *People v. Simmons*, 210 Ill. App. 3d 692 (1991) (*infra* ¶ 91), for the proposition that the State has the burden of showing legal justification for a warrantless search if the defendant "was doing nothing unusual at the time of search." *Simmons*, 210 Ill. App. 3d at 699. *Simmons* is factually distinguishable from the instant case because it did not involve an emergency situation. Police officers in *Simmons* executed a search warrant authorizing them to search (1) a particular location and (2) an unidentified black male, described as approximately 5 feet 8 inches and 180 pounds, with brown hair, brown eyes, a medium complexion, and approximately 22 years of age. *Simmons*, 210 Ill. App. 3d at 694. The warrant authorized the police to search for cocaine and paraphernalia associated with the use and sale of cocaine. *Simmons*, 210 Ill. App. 3d at 694. With the exception of a four-inch discrepancy in height, the physical description fit the defendant. *Simmons*, 210 Ill. App. 3d at 695. However, the appellate court found that the description would fit a large number of black males because most black men have brown eyes and brown hair. *Simmons*, 210 Ill. App. 3d at 698. When the police executed the search, there were other black males present with defendant, and the appellate court found that the State presented no evidence to explain why the officers chose to search the defendant rather than the other men present. *Simmons*, 210 Ill. App. 3d at 698. The warrant was found to be too general to support a search of the defendant. *Simmons*, 210 Ill. App. 3d at 698.

¶ 45    In *Simmons*, the State argued that, even if the warrant was too general to support the search of the defendant, the police were authorized to make a warrantless search based on probable cause to prevent the disposal or concealment of the cocaine described in the warrant. *Simmons*, 210 Ill. App. 3d at 699. The appellate court stated that warrantless searches are *per se* unreasonable, and the State has the burden of proving a connection between the searched individual and the premises or that independent probable cause existed to search the person on the premises. *Simmons*, 210 Ill. App. 3d at 699. The appellate court found that defendant was not an occupant of the premises, so the State was required to prove independent probable cause to justify the search. *Simmons*, 210 Ill. App. 3d at 700. The appellate court ultimately concluded that the State presented no evidence to establish independent probable cause to search the defendant; there was no contraband in open view and the defendant did not act suspiciously and he cooperated with police. *Simmons*, 210 Ill. App. 3d at 700.

¶ 46    Contrast *Simmons* with the case at bar, in which the police received multiple calls to 911 claiming that gunshots had been fired in a particular location. In this case, the police were responding to an emergency situation, which creates an exception to the prohibition against

warrentless searches. *Venters*, 539 F.3d at 806-07. The State presented evidence of multiple calls to 911 complaining of gunshots, at least one of which specified that the shots were heard inside defendant's apartment. This evidence was sufficient to create the reasonable belief that an emergency situation necessitating a fast response existed. *Richardson*, 208 F.3d at 630 (holding that the 911 system "fits neatly with the central purpose of the exigent circumstances (or emergency) exception to the warrant requirement" because it informs police of people in need of immediate assistance); *Hanson*, 608 F.3d at 337 (holding that when police receive a call to 911 and the person on the other end cannot respond, that is sufficient to create the reasonable belief that an emergency exists, despite the fact that nonemergency reasons for the lack of a response exist as well). For these reasons, we do not find the cases cited by the dissent to be persuasive.

¶ 47   Based upon the totality of the circumstances known to the officers at the time, namely, that multiple people had dialed 911 complaining of hearing gunshots, it was reasonable to believe that someone had in fact fired a gun. See *Ferral*, 397 Ill. App. 3d at 705. Because it is reasonable to conclude that someone might have been injured from the gunshot, an emergency situation existed. *Fisher*, ___ U.S. at ___, 130 S. Ct. at 548. Police must be allowed to respond to emergencies in which someone may have been or is about to be injured. The multiple 911 calls created a reasonable belief that someone had been shot and was in need of assistance. Therefore, we find that the first prong of the test has been satisfied.

¶ 48                                    B. Probable Cause

¶ 49   The second prong requires that police have a reasonable basis, akin to probable cause, associating the emergency with the area to be searched or entered. *Ferral*, 397 Ill. App. 3d at 705. Probable cause exists when "the totality of the facts and circumstances known to the officers is such that a reasonably prudent person would believe that the suspect is committing or has committed a crime." *People v. Montgomery*, 112 Ill. 2d 517, 525 (1986). When determining whether probable cause exists, courts look to whether there was a probability of criminal behavior, rather than proof beyond a reasonable doubt. *People v. Garvin*, 219 Ill. 2d 104, 115 (2006). Courts need not use rigid metrics for determining whether probability of criminal behavior existed, but instead must examine " 'factual and practical considerations of everyday life on which reasonable prudent men, not legal technicians, act.' " (Internal quotation marks omitted.) *People v. Wear*, 229 Ill. 2d 545, 564 (2008) (quoting *People v. Love*, 199 Ill. 2d 269, 279 (2002)).

¶ 50   The United States Court of Appeals for the Eleventh Circuit has held that probable cause in an emergency situation is based upon a desire to locate potential victims and ensure their safety, rather than a reasonable belief that a search will disclose evidence of criminal activities. *United States v. Holloway*, 290 F.3d 1331, 1337-38 (11th Cir. 2002). The court held that, in an emergency situation, probable cause may be satisfied when officers reasonably believe that someone is in danger. *Holloway*, 290 F.3d at 1338.

¶ 51   The facts of *Holloway* are similar to the facts of the case before us. In *Holloway*, the police received multiple 911 calls reporting that people had heard gunshots and arguments at a given address. *Holloway*, 290 F.3d at 1332. The police arrived at the address, observed

two people sitting on the porch, and, "[d]ue to the high-risk nature of the 911 call," one officer drew his service weapon as he exited his vehicle. *Holloway*, 290 F.3d at 1332. The police officers secured the residents in handcuffs, but did not question them, then proceeded to search the residence for firearms and gunshot victims. *Holloway*, 290 F.3d at 1332-33. The search revealed a shotgun and spent shells. *Holloway*, 290 F.3d at 1333.

¶ 52    The Eleventh Circuit concluded that the search did not violate the fourth amendment because the officers were operating under a belief that an emergency existed and someone may have been shot and in need of medical attention. *Holloway*, 290 F.3d at 1338. The court made special mention of the fact that the 911 call was anonymous and that the United States Supreme Court had previously held that an anonymous tip, by itself, was unreliable. *Holloway*, 290 F.3d at 1338 (citing *Florida v. J.L.*, 529 U.S. 266 (2000)). The Eleventh Circuit pointed out that the call in *J.L.* did not report an emergency, but instead merely reported that an individual had been observed carrying a firearm, an act of general criminality. *Holloway*, 290 F.3d at 1338 (citing *J.L.*, 529 U.S. at 268). The Eleventh Circuit reasoned that this was different from an anonymous report of a gun actually being fired, which was the situation in *Holloway*. *Holloway*, 290 F.3d at 1338-39. The Eleventh Circuit pointed out that the Supreme Court anticipated that an ongoing emergency was distinguishable from "general criminality." *Holloway*, 290 F.3d at 1338-39. In *J.L.*, the Court held that, had the caller reported someone carrying a bomb, the emergency exception would have been triggered. *Holloway*, 290 F.3d at 1338-39 (citing *J.L.*, 529 U.S. at 273-74). See also *United States v. Whitaker*, 546 F.3d 902, 909-10 (7th Cir. 2008) (holding that a report of an ongoing emergency is sufficient to create probable cause to detain someone and is distinguishable from *J.L.*).

¶ 53    The facts of the case at bar, similar to those in *Holloway*, also established probable cause for the officers to search the defendant's home. The police had received multiple 911 calls complaining that the callers had heard gunshots at the South Wells building. One such call specifically stated that the shots were heard from the first-floor rear apartment. The calls created the reasonable belief in the officers that criminal activity had occurred in the first-floor rear apartment of the South Wells building and that someone inside the apartment could be seriously injured. See *Holloway*, 290 F.3d at 1338 (holding that probable cause may be established by a reasonable belief that someone is in danger). Responding to the call, the police entered the apartment for the express purpose of performing a safety check to ensure that no one had been injured or was in need of medical assistance.

¶ 54    Defendant's arguments that the police did not know whether or not they had entered the correct apartment and that the officers had never observed defendant fire a gun are deemed forfeited because defendant cites no authority to support these arguments. The Illinois Supreme Court requires that parties to an appeal support their arguments with citation to authority when they submit briefs. Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008). Failure to do so amounts to a waiver of the argument. *People v. Sambo*, 197 Ill. App. 3d 574, 585-86 (1990); *People v. Trimble*, 181 Ill. App. 3d 355, 356-57 (1989) (holding that a party's failure to cite authority would place too great a burden on the reviewing court, forcing it to do the party's research and advocacy in addition to judging the arguments' merits).

¶ 55    Regardless of defendant's failure to support his arguments with authority, defendant's

arguments against a finding of probable cause are not persuasive. Defendant argues that the police could not have known which apartment to approach, claiming that no caller had given a specific unit number. However, evidence shows that one caller had identified the "first floor rear" apartment, which adequately described the placement of defendant's apartment within the building.

¶ 56 Defendant also argued that, even under emergency circumstances, if the police did not know the specific apartment number from which the gunshots had originated, the police officers would be prohibited from performing a door-to-door search within the building. However, that was not the situation in this case. Officer Thomas received notice of multiple calls to 911 complaining of shots fired, and one of them specifically referred to the "first floor rear" unit of the two-flat building in question. The police were directed to a specific apartment, thus creating probable cause associating the emergency with the area to be searched, namely, the first-floor rear apartment. Therefore, this court finds that both elements of the test for the emergency aid exception to the warrant requirement have been met.

¶ 57 The dissent finds *Elder* and *Hanson* distinguishable, stating that they did not address when an appellate court may reverse the factual findings of a trial court and that *Hanson* did not involve a search and seizure. *Infra* ¶¶ 96-97. However, in both cases, police officers made warrantless entries into homes in response to 911 calls, and thus, the cases provide instruction for determining whether the police in the instant case were justified in making a warrantless entry pursuant to 911 calls. *Elder*, 466 F.3d at 1090; *Hanson*, 608 F.3d at 337.

¶ 58 The dissent finds that the anonymous nature of the 911 calls and the "woefully inadequate" information conveyed in the calls distinguishes the instant case from prior cases. *Infra* ¶ 86. Generally, anonymous tips to the police lack sufficient reliability. *J.L.*, 529 U.S. at 274. However, the 911 system is one of the most common and well-recognized methods of alerting police to ongoing emergencies, which necessitate that police respond quickly. *Richardson*, 208 F.3d at 630. Often, 911 calls are brief and anonymous because the caller is in danger. *Elder*, 466 F.3d at 1091. However, these callers are the very people most in need of protection, and to hold that "police cannot take steps to protect a caller's safety unless they know the caller's identity and 'reliability' would require them to act *un*-reasonably" and prolong the response time to in-progress emergencies. (Emphasis in original.) *Elder*, 466 F.3d at 1091.[3]

¶ 59 In *Hanson*, the Seventh Circuit held that the police were justified in entering a residence after receiving *no* information from the 911 call. *Hanson*, 608 F.3d at 337. The phone line was dead when the dispatcher picked up the call, and all attempts to reestablish contact with the caller failed.[4] *Hanson*, 608 F.3d at 337. The court held that this very lack of information

---

[3]Although the dissent finds the call in *Elder* distinguishable from the anonymous calls in the case at bar, the 911 call in *Elder* was also anonymous. *Elder*, 466 F.3d at 1091.

[4]When people make calls to 911, the dispatcher receives the phone number and address from which the call was made, thereby calling into question whether calls to 911 are ever "anonymous." See *Walker v. Litscher*, 421 F.3d 549, 552 (7th Cir. 2005) (in which a 911 dispatcher noted that a call was coming from a specific address when the eight-year-old caller was unable to provide her

is what made the police officers' belief that someone was in trouble reasonable. *Hanson*, 608 F.3d at 337-38. The 911 system is for reporting emergencies, and a dead line and the lack of a response to call-backs implies that the original caller is unable to pick up, most likely because the caller is experiencing an emergency. *Hanson*, 608 F.3d at 337.

¶ 60     The dissent (*infra* ¶ 99) finds that *Richardson* is distinguishable because the Seventh Circuit referred to it as a "close case," and the 911 call in the case conveyed more information to the police than the 911 calls in the instant case. *Richardson*, 208 F.3d at 627-28, 629. In *Richardson*, the caller claimed that the defendant had raped and murdered a woman and had hidden her body in his basement, and the caller described the defendant's house as a "drug house." *Richardson*, 208 F.3d at 627-28. The caller also provided the defendant's name, his own name, and his address, which was also the defendant's address. *Richardson*, 208 F.3d at 627-28. The police had received a 911 call one week before the call at issue in the case reporting a murder at the same address, but the call turned out to be a false alarm. *Richardson*, 208 F.3d at 628. The police found drugs but no murder victim. *Richardson*, 208 F.3d at 628. The court examined the facts before it and determined that, despite the previous unfounded call and the fact that the call reported that someone was already dead rather than in danger, the police were justified in entering and searching the defendant's home under the emergency aid exception. *Richardson*, 208 F.3d at 631.

¶ 61     The relevant examination of the instant case in relation to *Richardson* is not whether there were fewer facts known to police, but whether the facts available to the police created the objectively reasonable belief that an emergency was in progress. In the instant case, the police were responding to complaints of shots being fired inside an apartment, which created the reasonable belief that someone had been shot and might be in need of aid inside the apartment, necessitating a quick response.

¶ 62     The dissent distinguishes the facts in the case at bar from those in *Richardson* by stating that the police here should have investigated the scene before entering the apartment in order to corroborate the claims made in the 911 calls. *Infra* ¶ 94 ("*United States v. Richardson*, 208 F.3d 636, 630 (7th Cir. 2000) (additional information known to the responding police officers beyond the detailed information in the 911 call made the officers' entry into the purported 'drug house' objectively reasonable in a close case)."). However, the *Richardson* court specifically found the opposite to be true. "The police officers' claim of exigent circumstances was *based entirely on the 911 call*, and the 911 operators had received a bogus call with almost exactly the same report only a week earlier." (Emphasis added.) *Richardson*, 208 F.3d at 629. The "close case" nature of *Richardson* arose from the fact that the police were responding to a 911 call very similar to one made the week before that turned out to be a false alarm. *Richardson*, 208 F.3d at 629. There were no previous false alarms in the case at bar, which makes the police's actions more objectively reasonable than they were in *Richardson*. If police had the time to investigate each 911 call, there would be no need to have an emergency aid exception.

¶ 63     The dissent places a lot of weight on the fact that the calls in the case at bar were

address).

anonymous and could have been false alarms, similar to the prior call in *Richardson*. *Infra* ¶ 93. *Richardson*, 208 F.3d at 628. However, the *Richardson* court specifically pointed out that it had no evidence to indicate that "the 911 system is abused so often that it is objectively unreasonable for the police to rely on a call." *Richardson*, 208 F.3d at 631. Furthermore, some of the very cases the dissent tries to distinguish were based on anonymous 911 calls. *Elder*, 466 F.3d at 1090-91 (holding that because many 911 callers are in danger, calls are brief and anonymous, and that these are the callers who are most in need of immediate police aid); *Hanson*, 608 F.3d at 337, 340 (holding that the police were justified in invoking the emergency aid exception in response to a 911 call in which no information was given because the phone line went dead and the police could not reestablish contact with the caller). Compare *J.L.*, 529 U.S. at 268, 274 (holding that an anonymous tip was insufficient for the police to stop and frisk the defendant when the tip did not report an emergency in progress, stating only that the defendant was carrying a gun).

¶ 64    Therefore, we do not find persuasive the dissent's argument that the facts in this case are insufficient to trigger the emergency aid exception; the real question is not the number of facts, but whether the facts available supported an objectively reasonable belief that an emergency existed.


¶ 65                          IV. Ordering The Occupants Out

¶ 66    When determining whether a specific search or seizure violates the fourth amendment, courts must look to the facts and make a decision based upon the totality of the circumstances. *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). The United States Supreme Court has frequently declined to adopt bright line or *per se* rules for determining whether government action violates the fourth amendment. *Robinette*, 519 U.S. at 39. See also *Florida v. Bostick*, 501 U.S. 429, 439 (1991) (reversing the Florida Supreme Court's adoption of a *per se* rule stating that questioning on a bus always constitutes a seizure).

¶ 67    In this case, we are troubled by the police officers' command that the residents leave their home before they performed the warrantless safety check. The United States Court of Appeals for the Ninth Circuit has held that police officers who act without warrants normally cannot order people out of their homes for the purposes of arresting the occupant or searching the home. *United States v. Al-Azzawy*, 784 F.2d 890 (9th Cir. 1985). The court held that even though the defendant had exited his trailer, which he had only done upon the orders of the police, he had only done so under circumstances of "extreme coercion." *Al-Azzawy*, 784 F.2d at 893. Therefore, under the fourth amendment, the arrest occurred inside his trailer. *Al-Azzawy*, 784 F.2d at 893. The court cited to a Sixth Circuit case which held that the " 'location of the arrested person, and not the arresting agent' " is what determines where the arrest occurred. *Al-Azzawy*, 784 F.2d at 892 (quoting *United States v. Morgan*, 743 F.2d 1158, 1164 (6th Cir. 1984)). The United States Supreme Court has adopted the reasoning that the location of the arrested person controls where the arrest occurred. *Elder v. Holloway*, 510 U.S. 510, 513-14 (1994) (quoting *Al-Azzawy*, 784 F.2d at 893).

¶ 68    In *Al-Azzawy*, although the Ninth Circuit held that the defendant was arrested in his home, which would otherwise be a violation of the fourth amendment, it subsequently

concluded that exigent circumstances existed. *Al-Azzawy*, 784 F.2d at 895. The court found that the police had a reasonable belief that the defendant was keeping explosives in his trailer. *Al-Azzawy*, 784 F.2d at 895. Therefore, even though the arrest occurred in the defendant's home and without a warrant, the court found that it did not violate the fourth amendment.

¶ 69 Similarly, in the case at bar, in light of the totality of the circumstances, we do not find that the police officers' command to exit the apartment was enough to violate the fourth amendment. The police had the right to enter the apartment because both prongs of the emergency aid exception had been satisfied. The police had no reason to order the residents out of the apartment and could have performed the safety check with them inside. But, based on all of the facts at issue, which include the multiple calls to 911 complaining of shots fired from the apartment, the search itself did not violate the fourth amendment because exigent circumstances existed.

¶ 70                   V. Defendant's Arguments Regarding Cited Authority

¶ 71 Defendant argued extensively that authority cited by the State was factually distinguishable from the case at bar and should not be relied upon by this court in making its decision. Defendant's arguments once again rest on the claim that the officers did not know which unit to investigate or that the officers could not be sure whether or not the sounds reported by the callers were in fact gunshots. As previously explained, the officers were directed to a specific unit, and a 911 call reporting gunshots is sufficient to create a reasonable belief that an emergency exists, even though not all 911 calls turn out to be genuine. See *Hanson*, 608 F.3d at 337.

¶ 72 Defendant cites *Ferral*, *United States v. Porter*, 594 F.3d 1251 (10th Cir. 2010), *Fisher*, and *Brigham City* to argue that the police did not know enough about the situation inside defendant's apartment to justify entering without a warrant. Defendant pointed out that, in *Ferral*, the defendants were observed committing a crime. *Ferral*, 397 Ill. App. 3d at 699. In *Porter*, the caller to 911 specifically named the defendant as the perpetrator. *United States v. Porter*, 594 F.3d 1251, 1253 (10th Cir. 2010). In *Fisher*, the police responded to a report of a man "going crazy," and upon arriving at the scene, the officers observed multiple signs of "chaos." *Fisher*, ___U.S. at ___, 130 S. Ct. at 547. In *Brigham City*, police responded to a noise complaint at 3 a.m. and, upon arrival, observed a physical altercation occurring inside the house. *Brigham City*, 547 U.S. at 400-01.

¶ 73 This court has already explained that these factual differences do not undermine the police officers' reasonable belief that an emergency was in progress. When examining whether probable cause existed, courts must not adhere to a specific metric, but, rather, must apply reason to the facts presented. *Wear*, 229 Ill. 2d at 564. Each case is unique; sometimes a warrantless search satisfies the emergency aid exception based upon minimal facts known to police at the time of the search. *Hanson*, 608 F.3d at 337-38 (in which the only facts known were that someone had made a 911 call, hung up before speaking, and did not answer the phone when the dispatcher tried to return the call). Other times, a warrantless search will be found unreasonable based upon the numerous facts known to police at the time of the

search. *Feddor*, 355 Ill. App. 3d at 327-28, 331-32 (in which the police knew very specific details about the defendant's physical state and the identity of the citizen who contacted the police station).

¶ 74    The United States Supreme Court in *J.L.* stated in *dicta* that circumstances may occur in which an anonymous 911 call would be sufficient to form probable cause for a search. *J.L.*, 529 U.S. at 273-74. *Holloway* interpreted this to mean that an anonymous 911 call reporting an ongoing emergency is sufficient to form a reasonable belief that an emergency is in progress. *Holloway*, 290 F.3d at 1338-39; *Whitaker*, 546 F.3d at 909-10. Reports of gunshots certainly qualify as an ongoing emergency because someone could have been seriously injured. The fact that no one witnessed the shootings is irrelevant in this case because the shots were reported as coming from inside an apartment. If someone inside had been shot, he or she would be unlikely to call 911 because (1) he or she may be too injured to use the phone, (2) he or she may be under a threat of violence from the shooter, or (3) both scenarios could be true. See *Hanson*, 608 F.3d at 337 (finding that multiple reasons could exist for someone not to call or answer a phone, including being injured or threatened).

¶ 75    Defendant also criticizes the State's use of *People v. Garvin*, 219 Ill. 2d 104 (2006), to define probable cause. In *Garvin*, the Illinois Supreme Court held that probable cause requires only the "probability of criminal activity, rather than proof beyond a reasonable doubt." (Internal quotation marks omitted.) *Garvin*, 219 Ill. 2d at 115. Defendant points out that the court continued its analysis of probable cause by adding that if questions both of whether a crime has been committed and whether a particular individual committed the crime, "additional evidence is required to show probable cause." *Garvin*, 219 Ill. 2d at 115 (citing *People v. Lee*, 214 Ill. 2d 476, 485 (2003)).

¶ 76    Garvin is distinguishable from the present case because the situation in *Garvin* was not an emergency. In *Garvin*, a citizen called the police to complain that he had noticed a license plate stolen from one of his company's vehicles had been placed on a white van. *Garvin*, 219 Ill. 2d at 107. Defendant was not reported to possess a weapon, and at no point was anyone's life in danger. *Garvin*, 219 Ill. 2d at 107-08. In contrast, *Holloway* held that the standard for probable cause is different when someone's life is at risk, which was not the case in *Garvin*. *Holloway*, 290 F.3d at 1338.

¶ 77    In addition, the dual questions of whether a crime had been committed and whether a particular individual had committed the crime were not in issue in the case at bar. The officers were directed to a specific unit, from which, according to multiple calls to 911, gunshots had been heard. Therefore, it was reasonable to believe that the person responsible for firing a gun was located inside the apartment. See *Garvin*, 219 Ill. 2d at 115 (holding that the defendant's presence in and around the stolen vehicle created a reasonable belief that the defendant was involved in committing a crime). Defendant's attempts to factually distinguish these cases is not persuasive.

¶ 78    At oral arguments, defendant argued that the multiple calls to 911 did not trigger the emergency aid exception because the content of the calls did not allege sufficient facts to cause a reasonable person to believe that an emergency existed. Furthermore, defendant argued that the United States Supreme Court cases cited were inapposite because the facts

-19-

of those cases involved the responding officers observing suspicious, violent, or chaotic activity at the locations mentioned in the 911 calls. See *Brigham City*, 547 U.S. at 400-01; *Fisher*, ___ U.S. at ___, 130 S. Ct. at 547. We do not find this argument persuasive.

¶ 79    The purpose of the 911 call system is to alert police to emergencies in progress. *People v. Cardamone*, 232 Ill. 2d 504, 520 (2009). In the case at bar, the police received numerous calls informing them that shots had been fired inside a residential structure. The purpose of the emergency aid exception is to ensure that police can quickly respond to situations in which someone may be in need of immediate aid. To hold that the police were not authorized to enter into a home in which multiple people had said shots had been fired would upset the purpose of the emergency aid exception. If 911 calls about shots being fired did not qualify as a trigger for the emergency aid exception and the police did not enter defendant's apartment until they obtained a warrant, a potential victim of the gunshots complained of would not receive the emergency aid he or she required. We can think of no greater need for immediate police action than to investigate claims of shots fired and uncover any potential victims in need of immediate attention.

¶ 80    We do not condone the fact that the police did not converse with the adult occupants of the home to further determine the extent of the emergency or request their permission to enter the premises. People do have rights in their home that prevent unlawful entry even by the police. *People v. Coleman*, 194 Ill. App. 3d 336, 340 (1990) (citing *Payton v. New York*, 445 U.S. 573, 589, 590-91 (1980)).

¶ 81    However, under the facts of this case, the emergency exception warranted immediate police action. The very experienced trial judge indicated on the motion to reconsider that if he had viewed the photos shown to him on the State's motion to reconsider as part of the evidence in the case, it would have made a "world of difference." However, as an accurate description of the buildings were depicted in the testimony of the police and for the reasons we have stated, we reverse and remand.

¶ 82                              CONCLUSION

¶ 83    For the above reasons, the judgment of the circuit court of Cook County quashing the arrest and suppressing evidence is reversed.

¶ 84    Reversed and remanded.

¶ 85    JUSTICE GARCIA, dissenting.

¶ 86    The State fails to marshal the facts that the evidence adduced at the original suppression hearing established, which compel the conclusion that the circuit court erred in its suppression order. Nor does the State cite a single case that resulted in the reversal of a grant of a motion to quash arrest and suppress evidence with facts or circumstances that are similar to the instant case. As a consequence, I remain unconvinced that the police acted lawfully in searching the defendant's residence when the State offered nothing more to justify the search than anonymous 911 calls that claimed "shots fired" at a multiunit building. I find the

information conveyed in the 911 calls woefully inadequate to trigger the emergency aid exception to the warrant requirement of the United States and Illinois Constitutions.

¶ 87    The circuit court judge below did not set forth his "findings of fact and conclusions of law upon which the order [granting the motion] is based" as directed by section 114-12(e) of the Code of Criminal Procedure of 1963 (725 ILCS 5/114-12(e) (West 2010)). Nonetheless, our assessment of the evidence adduced at the suppression hearing must be consistent with the circuit court's ruling that the search of the defendant's home and his subsequent arrest were unlawful, unless the manifest weight of the evidence is to the contrary. See *People v. Adams*, 394 Ill. App. 3d 217, 226 (2009) (the ruling on the suppression motion "conveys certain implicit findings" in the absence of express findings). In a simple case such as this where only one witness testified, we need only look to the clear facts established by the officer's testimony and the reasonable inferences arising from that testimony, consistent with the circuit court's ruling on the suppression motion, to assess whether the circuit court's decision is supported by the record. *Id.* Based on the record before us, I cannot agree with the majority that, as a matter of law, the State met its burden to establish that the Chicago police officers' search of the defendant's home was constitutional under the emergency aid exception to the warrant requirement. See *People v. Simmons*, 210 Ill. App. 3d 692, 696 (1991) (State must demonstrate legal justification for warrantless search if the defendant was doing nothing unusual at the time of the search).

¶ 88    The only evidence heard in this case was at the evidentiary hearing on the defendant's motion to quash arrest and suppress evidence held on June 29, 2010, at which only Chicago police officer Andrew Thomas testified. Officer Thomas testified that he and his partner were dispatched to a "two flat multiunit" building on South Wells Street. Thomas testified that there were multiple calls to 911 claiming that gunshots had been heard coming from that location. No specific unit number at the South Wells address was given, but at least one call claimed that shots were fired in and around the "first floor rear." According to Thomas, he received information that the calls claimed shots were heard both inside and outside the first-floor rear unit at the South Wells address and that a door had been loudly slammed. Thomas and his partner arrived at the given address within two to three minutes of the first dispatch. Thomas acknowledged there were "other [residential] units there as well." Thomas knocked on the rear door of a unit while announcing his office. A child about two to four years old opened the door. When the door opened, Thomas was able to see inside the unit. The officer noted nothing out of the ordinary in the residence when he peered inside. He saw no look of distress on the children or the adults in the kitchen; he noticed no one bleeding or appearing to be injured; he saw no contraband. Without asking a single question of the occupants regarding possible shots being fired within the unit or making a single observation to confirm that the calls of shots fired concerned the defendant's residence, the officers effectively seized the residence by ordering everyone out, including the defendant, before searching the residence. On questioning by the State, Officer Thomas explained, he "searched that residence to make sure that no one inside that apartment had been shot." "[I]t was basically for the safety of the public and anyone that could have been inside that apartment."

¶ 89    Judge Marcus R. Salone, whom we acknowledge is a very experienced trial judge (and now a colleague on this court), while not issuing express findings of fact and conclusions of

law pursuant to statute, was clear in his ruling. Calls to 911 may be anonymous sometimes because the caller is not motivated by public safety as the trial judge noted: "Maybe it's a legitimate call, maybe not." The experienced judge also questioned the officers' decision to order everyone out of the residence, which permitted the officers to conduct the search of the residence outside the presence of any of the occupants: "Based upon [a high number] of calls, it's now okay for the police to go through your underwear drawer. Let's search. Who knows. Because we *** got this call. So let's see." Ultimately, the circuit court judge concluded that the emergency aid exception to the warrant requirement, which seeks to strike a balance between protecting the rights of citizens in their own home and permitting law enforcement officers to act reasonably in protecting persons and property, was not met in this case: "I didn't hear a balance between protecting the rights of citizens in a home and public safety."

¶ 90    The State's argument, as formulated by the majority, "that the trial court based its decision in part on the belief that the police officers searched through drawers and crawl spaces at defendant's apartment" (*supra* ¶ 21), is preposterous. No reasonable person would read the record before us as the State does, claiming that the experienced circuit court judge issued findings of fact that the responding officers searched "drawers and crawl spaces at defendant's apartment" when no testimony to that effect was ever introduced. That language was clearly hypothetical and was meant only to highlight the officers' unjustified decision to order everyone out of the residence before conducting the so-called safety inspection, a decision even the majority calls into question (*supra* ¶¶ 65-69).

¶ 91    Even if there existed some basis on the record before us to reject the trial judge's implicit factual findings and the reasonable inferences arising therefrom that are consistent with his ruling that the search and arrest were unlawful, that alone does not justify the reversal of the circuit court's grant of the defendant's motion. It was the State's burden to justify the officers' search of the residence. *Simmons*, 210 Ill. App. 3d at 696. It bears that same burden before us.

¶ 92    Before this court, the State fails to tell us what evidence adduced at the June 29, 2010 suppression hearing compels the legal conclusion that the officers' search of the defendant's home was lawful. Nor has the State presented us with any authority that it is permitted to "supplement" the woefully insufficient evidence adduced at the suppression hearing with its efforts at the "Reconsideration Hearings," as if the experienced trial judge had either reopened the evidence to consider the supplemental evidence, a request the State never made, or seriously entertained arguments not grounded on the evidence adduced at the suppression hearing. See *Klaskin v. Klepak*, 126 Ill. 2d 376, 394-95 (1989) ("Where several inferences may be drawn from conflicting evidence, the reviewing court must accept that which supports the trial court's decision."). The judge made clear his rulings on the motions to reconsider: the State's efforts were too little, too late. The only substantive point we can take from the "Reconsideration Hearings" is that the judge did not change his original decision–the officers' search of the home was unlawful.

¶ 93    I cannot go along with the majority's decision to reverse the considered judgment of the trial judge, both as to questions of fact and law, where the only evidence supporting a decision contrary to the circuit court's is nothing more than anonymous 911 calls, uncorroborated by any observations of the responding police officers at the alleged scene of

the shootings. In my judgment, this case unjustifiably lowers the bar regarding the showing the State must make to justify police intrusion into the sanctity of a citizen's home based on the emergency aid exception. That multiple 911 calls were made in this case concerning repeated claims of "shots fired" adds little to justify a warrantless search, especially when it may well be that the multiple calls were made by the same caller. Nor are we free to conclude that the trial judge must have truly meant that the responding police officers searched "crawl spaces" and an "underwear drawer" when the State points to nothing more in the record for that outlandish claim than its strawman offering, made long after the trial judge had properly granted the defendant's motion.

¶ 94      To be clear, there is no disagreement regarding the analysis to be followed in this case. See *People v. Ferral*, 397 Ill. App. 3d 697, 705 (2009) (two-step analysis to determine whether the emergency aid exception applies). My disagreement with the majority is with its conclusion that the analysis mandates a reversal of the decision entered in this case. The federal cases cited by the majority do not support the reversal of the grant of the motion to suppress, grounded as the search was on anonymous 911 calls without a single observation by the responding officers that would corroborate the claims in the 911 calls to render the officers' actions objectively reasonable. See *United States v. Richardson*, 208 F.3d 626, 630 (7th Cir. 2000) (additional information known to the responding police officers beyond the detailed information in the 911 call made the officers' entry into the purported "drug house" objectively reasonable in a close case).

¶ 95      Nor does this case provide a reasonable basis, "approximating probable cause," to justify the officers' search of the defendant's home based on an apparently single anonymous 911 call, of the unknown number of calls that were received, that claimed that shots may have been fired inside the rear, first-floor apartment. *Ferral*, 397 Ill. App. 3d at 705. To be clear, I am not advocating that a single 911 call can *never* provide reasonable grounds to believe an emergency exists. *Cf. Richardson*, 208 F.3d at 630 (the court rejected "a presumption under which a 911 call could never support a finding of exigent circumstances"). Whether a single call provides a reasonable basis necessarily turns on the details conveyed in the 911 call. There were no details in the 911 calls in this case to approximate probable cause for a search.

¶ 96      The federal cases of *United States v. Elder*, 466 F.3d 1090 (7th Cir. 2006), and *Hanson v. Dane County*, 608 F.3d 335 (7th Cir. 2010), are readily distinguishable from the instant case. *Elder* involved the review of a denial of a motion to suppress. In *Elder*, law enforcement officers were dispatched to a farm following a 911 call concerning a "meth lab." *Elder*, 466 F.3d 1090. The caller hung up before the 911 operator was able to ask any questions and no one answered at the originating number when the operator called back. *Id.* The lack of an answer triggered a concern for the safety of the caller. *Id.* Upon arriving at the farm, officers could see lights on in the house but no one answered knocks on the door. *Id.* There was a nearby outbuilding, which the district court judge found to have an open door. *Id.* From outside the threshold of the outbuilding door, "the officers saw what appeared to be a laboratory." *Id.* The officers entered the outbuilding and confirmed by both vision and smell the existence of a meth lab. *Id.* The district court found the officers' entry to the outbuilding reasonable. *Id.* In affirming the district court's denial of the defendant's

suppression motion, the reviewing court, in its two-page opinion, did not address at any length the district court's findings of fact and conclusions of law.

¶ 97　　*Hanson* concerned a civil rights lawsuit (pursuant to 42 U.S.C. § 1983 (2006)), involving an allegedly unlawful arrest. *Hanson*, 608 F.3d at 337. In that case, a 911 call was made in which the caller hung up before the call was answered. *Id.* Officers were dispatched to the address of the call and entered the home without permission. *Id.* At the home, the officers learned that the wife had called 911 after being bumped by the husband during a heated argument. *Id.* The wife's statement provided probable cause to arrest the husband for domestic battery. *Id.* The wife refused to cooperate with the prosecution, which led to the dismissal of the charge. *Id.* The husband then filed a section 1983 action, "contending that the police violated the fourth, fifth, and fourteenth amendments to the Constitution." *Id*. The district court granted summary judgment to the defendants, which the court of appeals affirmed. *Id.* at 337, 340. The court of appeals, as did the district court, concluded "that a 911 call provides probable cause for entry, if a call back goes unanswered." *Id.* at 337. *Hanson* did not involve a search of the residence, resulting in the seizure of a weapon as occurred in this case. Nor does *Hanson* provide any guidance on when findings of fact should be rejected in reversing a trial court's decision granting the defendant's motion to quash arrest and suppress evidence.

¶ 98　　The *per curiam* opinion by the United States Supreme Court in *Michigan v. Fisher*, ___ U.S. ___, 130 S. Ct. 546 (2009), addressed circumstances that were extreme in comparison to the circumstances in this case. In *Fisher*, police officers responded to a complaint of a disturbance and were directed to a particular residence by neighbors. *Id.* at ___, 130 S. Ct. at 547. At the residence, the officers observed "a household in considerable chaos: a pickup truck in the driveway with its front smashed, damaged fenceposts along the side of the property, and three broken house windows, the glass still on the ground outside." *Id.* at ___, 130 S. Ct. at 547. There was blood on the hood of the pickup. *Id.* at ___, 130 S. Ct. at 547. Looking through a window, "the officers could see respondent, Jeremy Fisher, inside the house, screaming and throwing things." *Id.* at ___, 130 S. Ct. at 547. The officers had to force their way into the house because Fisher had placed a sofa against the front door. *Id.* at ___, 130 S. Ct. at 547. The Michigan lower courts ruled the emergency aid exception to the warrant requirement was not triggered by the undisputed facts. *Id.* at ___, 130 S. Ct. at 548. The Supreme Court ruled to the contrary. In gaining entry to the home, the officers acted "upon their need to assure that Fisher was not endangering someone else in the house." *Id.* at ___, 130 S. Ct. at 549.

¶ 99　　The *Richardson* case also highlights by comparison the woefully inadequate information conveyed in the multiple 911 calls that the State contends triggered the emergency aid exception here. *Richardson* concerned a 911 call, reporting "that a 19-year-old African-American man named 'Lucky' had raped and murdered a female," with the caller stating that the body could be found in the basement of a given residence, which the caller described as a "drug house." *Richardson*, 208 F.3d at 627-28. The caller also provided his name and stated he lived at the home where the body was located. *Id.* at 628. The police had received a call of a murder at that same location the week before, which turned out to be false. *Id.* The responding officers encountered the defendant outside the residence. They related the call

regarding a dead body at the residence to the defendant. *Id.* Richardson responded "that this was the second time that week that this had happened." *Id*. The responding officers searched the home and discovered drugs, but no body. *Id.* The defendant filed a motion to suppress the drugs seized during the warrantless search of his home. *Id.* The district court denied the motion, which the court of appeals affirmed. *Id.* at 628-29. Of note, the court of appeals declared *Richardson* to be "a very close case." *Id.* at 629. Nonetheless, the court explained "that 911 calls reporting an emergency can be enough to support warrantless searches under the exigent circumstances exception, particularly where, as here, *the caller identified himself*." (Emphasis added.) *Id.* at 630. In the course of addressing the concerns of both the defendant and the district court in permitting a search based solely on a 911 call, the *Richardson* court acknowledged the possibility that the 911 system could be subject to abuse if "phony calls about their neighbors [would provide justification for] the police to enter and search their neighbors' property without a warrant." *Id.* at 631. "While we do not exclude the possibility of a case in which it would be objectively unreasonable for a police officer to rely on a 911 call, *because of additional information available to the officer*, this is not that case." (Emphasis added.) *Id.* I submit that the case before us is precisely "that case."

¶ 100       None of the cited federal cases, *Richardson*, *Hanson*, *Elder*, or *Fisher*, is similar to the instant case, which involved only the barest of facts conveyed in the 911 calls. The opinion in this case distressingly lowers the showing the prosecution must make to invoke the emergency aid exception, at least by comparison to the cited federal cases. Based on the majority's decision, the State need only point to multiple anonymous 911 calls concerning "shots fired" to invoke the emergency aid exception to justify the search of a private residence by law enforcement officers even when the responding officers fail to ask any questions or observe anything that might confirm that the calls are legitimate. See *In re Mario T.*, 376 Ill. App. 3d 468, 475 n.3 (2007) (quoting *Florida v. J.L.*, 529 U.S. 266, 275 (2000) (Kennedy, J., concurring, joined by Rehnquist, C.J.) ("If the telephone call is truly anonymous, the informant has not placed his credibility at risk and can lie with impunity. The reviewing court cannot judge the credibility of the informant and the risk of fabrication becomes unacceptable.")). The anonymous 911 calls in this case may reflect the possible abuse of the 911 system that can result in the unfettered (and hence unconstitutional) intrusion into a home that *Richardson* recognized as a possibility. See *People v. Lenyoun*, 402 Ill. App. 3d 787, 800 (2010) ("physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed" (internal quotation marks omitted)).

¶ 101       Unlike *Richardson*, the barest of information provided by the 911 calls makes the instant case not a "close case" in favor of invoking the emergency aid exception. While officers being sent to the location to investigate the calls of shots fired was undeniably the right response from the Chicago police department, the calls, standing alone, did not reasonably and objectively justify the action taken by the officers of ordering all the occupants out of the apartment and conducting a search without any effort by the responding police officers to corroborate, by their own observations or inquiries, the legitimacy of the anonymous 911 calls.

¶ 102       Accordingly, I dissent.