2021 IL App (1st) 190692

No. 1-19-0692

Modified opinion filed January 28, 2021

FOURTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
|---|---|---|
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15 CR 6105 |
| ABDULLAH ALJOHANI, | ) ) | The Honorable Timothy Joseph Joyce, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices Lampkin and Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1    After a bench trial in Cook County circuit court, defendant Abdullah Aljohani, age 27, was convicted of the first degree murder of his roommate, Talal Aljohani, who was found stabbed to death in their apartment on March 15, 2015. Although they shared the same last name, the victim and defendant were not related. Defendant was sentenced to 23 years with the Illinois Department of Corrections (IDOC).

¶ 2    On this direct appeal, defendant claims (1) that the trial court erred in denying his motion to suppress evidence, on the ground that the police officers' warrantless entry into the

apartment immediately after the murder was not justified by the community caretaking exception, (2) that the trial court erred by admitting evidence of defendant's flight as circumstantial evidence of his guilt, and (3) that the State's evidence was insufficient either to prove defendant guilty beyond a reasonable doubt or to justify denying defendant's motion for a directed finding.

¶ 3        For the following reasons, we do not find these claims persuasive and affirm.

¶ 4                                    BACKGROUND

¶ 5        In brief, the State's evidence at trial established that defendant's downstairs neighbor heard sounds of wrestling and screaming coming from the apartment above. When the neighbor knocked on defendant's apartment door, defendant answered and stated that there had been an argument but everything was okay. Shortly thereafter, officers found the victim stabbed to death inside the apartment, with a broken and bloody knife nearby. The parties stipulated that a forensic chemist would testify that DNA from blood on the knife blade matched the victim and DNA found on the knife handle matched defendant's DNA.

¶ 6                              I. Pretrial Proceedings

¶ 7        At the suppression hearing on defendant's pretrial motion to suppress, defendant bore the burden of proof, and he argued that the officers' "entry" into his apartment was illegal without a warrant and anything "recovered pursuant to the illegal entry" should be suppressed.

¶ 8        The defense called Officer Banito Lugo of the Chicago Police Department as its sole witness. Lugo testified that, on March 15, 2015, at 4:15 a.m., he and his partner, Officer Anthony Richards, responded to a call concerning a battery in progress at defendant's apartment building. Khalid Ali, a neighbor and the person who had called the police, met them outside the building. Ali told the officers that he understood Arabic and that he had heard a

loud verbal argument between two men in Arabic in the apartment above, which was followed by the sound of two people wrestling. Ali then heard a person asking "are you ok, get up," and he heard the wrestling stop. Ali further informed the officers that he went upstairs, where he spoke with defendant, and that defendant stated that the victim, whom defendant described as his brother, was in the bathroom.

¶ 9       Lugo testified that, after Ali let them into the building, they went upstairs and knocked on defendant's apartment door and talked to defendant. Defendant stated in English that everything was okay. The officers asked if they could speak with his "brother," and defendant replied that he was sleeping. The officers went back downstairs, where Ali was "adamant" that someone was seriously injured, so the officers went back upstairs and knocked again on defendant's door. This second time, the officers knocked for five minutes and received no response. Then they exited the building and returned to their squad vehicle, where they punched in a code to indicate that they had completed their assignment and everything was okay. Despite punching in the code, the officers did not depart. Instead, they drove around the building and into the alley behind the building because, as Officer Lugo explained, "[s]omething didn't feel right." After parking, they observed that the back gate was open. The officers then proceeded into the yard and found that the garage door was open and the side entrance to the back of the building was also open. The officers entered the side entrance and went back up to the second-floor apartment, where they observed that the back door to the apartment was "wide open."

¶ 10      Lugo testified that they knocked on the back door and announced their "office" but received no response. The officers entered the apartment, walking first into a hallway where they did not observe anything unusual. The officers then decided to look through the apartment

3

room by room, until they arrived at the southeast bedroom, where they observed the victim lying on a mattress. Observing no wounds at first, the officers again announced their "office" and received no response. After determining that the victim was unresponsive and not breathing, they called for an ambulance. Defendant was no longer present in the apartment. The officers were not asked any questions about any further search after the discovery of the body.

¶ 11　　　　Prior to closing argument on the suppression motion, the trial court asked defense counsel what exactly defendant was seeking to suppress. Counsel responded that there was a subsequent search of the apartment and it was the items recovered during this subsequent search that defendant was seeking to suppress. The court then asked: "So the defense is seeking to suppress anything the State wants to put into evidence that was recovered from this apartment up on the second floor?" When both parties agreed, the court explained that it wanted to ensure that "we're on the same page with respect to what the defense is trying to do." When both parties said yes, the court stated: "I'll consider that a stipulation."

¶ 12　　　　In closing, the State argued that "this falls squarely within the emergency aid doctrine." The State also argued forfeiture by wrongdoing and inevitable discovery. With respect to forfeiture, the State argued that defendant cannot be allowed to silence the only other person who would have been able to consent to the police's entry to help him. The defense argued that "there was nothing unusual" about defendant's behavior when he answered the door and the officers did not ask him at that time for consent to enter the apartment because they had no concerns. When the officers drove to the back of the building, they had no information about how long the gate or the door had been open.

¶ 13         After listening to the testimony and the arguments of counsel, the trial court found, "first[,] I believe Officer Lugo." The court observed that, when the police went back up to the second-floor apartment a second time and knocked for a solid five minutes at "4:15 in the morning," the fact that no one answered "clearly gave them pause," and "that's why" they went downstairs and drove to the back of the building. At the back of the building, they observed "a garage door open, the back gate open, this side door to the apartment building open," and the back door to the apartment open. The trial court found it "reasonable" that "they wanted to make sure that no one is in any distress." The trial court found that the officers "were not investigating a crime, they had no reason to believe a particular crime had taken place. They wanted to make sure that everyone was okay." This desire was further supported by the fact that the police knew that there had just been "some kind of physical altercation *** where somebody was heard to say are you okay, get up."

¶ 14         In conclusion, the trial court found that "the circumstances herein taking place without any warrant by the police falls squarely within the community caretaking function," and the motion to suppress was denied.

¶ 15                                                    II. Trial

¶ 16         The bench trial proceeded immediately after the conclusion of the pretrial suppression hearing, and the parties stipulated that, if called to testify, Officer Lugo would provide the same testimony that he had provided during the pretrial suppression hearing. The trial court accepted the stipulation, "[s]ubject to an appreciation of whatever he testified to in the motion was admissible in the motion and might not be admissible at trial, [and] would be so considered by the Court."

¶ 17        The State's first witness at trial was Abduilhadi Aljohani, who testified that he was a police officer in Medina, Saudi Arabia. After identifying a photo of the victim as his brother, the witness testified that the victim grew up in Saudi Arabia and came to Chicago in December 2014 to attend college. In Chicago, the victim lived with defendant. Although the victim and defendant share the same last name, they were not related. The witness testified that he last spoke to the victim on the telephone the day before the victim died.

¶ 18        The State's next witness was Khalid Ali, the neighbor who had originally contacted the police. Ali, 46 years old, testified that he was born in Somalia and can understand Arabic. Since 2004, he has been a taxicab driver in Chicago. Ali lives with his wife and five children on the first floor of the same building where defendant and the victim lived on the second floor. Defendant and the victim moved into the building in December 2014, and Ali met them in January 2015. When they spoke together, they spoke mainly in Arabic.

¶ 19        Ali testified that in the early morning hours of March 15, 2015, his wife woke him up. After he woke up, he heard, first, the sounds of wrestling, and then he heard yelling and screaming, all coming from the upstairs apartment. Ali then heard defendant calling the victim's first name, "Talal, Talal," and next he heard "ah, ah," which sounded to him like "panic." Ali also heard defendant stating "come, come" which he understood to mean "stand up or wake up." Ali went upstairs and knocked on defendant's door, and defendant answered. When Ali asked "what happened," defendant replied that there was a small argument, but then defendant gave a two-thumbs up sign and stated "everything is okay."

¶ 20        Ali testified that, after defendant shut the door, Ali returned to his own apartment. However, after a few minutes, Ali went upstairs and knocked on defendant's back door. When defendant opened the back door, defendant stated again that "everything is okay." Ali asked

where the victim was, and defendant replied that the victim was in the bathroom. However, through the open back door, Ali could observe the inside of the bathroom and could observe that the victim was not in it. The bathroom is directly in front of the back door. Ali testified that he had been in defendant's apartment before and there is only one bathroom. Ali asked defendant again where the victim was, and this time defendant replied that the victim was on the telephone talking with his family.

¶ 21        Ali testified that he asked defendant if he could observe the victim, and defendant repeated that the victim was on the telephone talking with his family. Ali asked again, and then defendant appeared "a little bit mad" and stated "do whatever" and closed the door. After returning to his own apartment, Ali called 911 to "mak[e] sure that Talal is okay." When the officers arrived, Ali met them outside, told them what he had heard, and let them into the building.

¶ 22        On cross-examination, Ali testified that, when his wife woke him up, she told him that she had heard defendant and the victim singing earlier that morning, at 1 or 2 a.m. Twenty or thirty minutes before she woke him up, she heard something being thrown and someone expressing pain and saying "awe." After Ali heard the wrestling, he called the owner of the building and told him the "upstairs guys are fighting."

¶ 23        Ali testified that he had had a good relationship with defendant, and he knew that both defendant and the victim were attending school. Ali had never heard defendant and the victim argue before and had never observed the victim drinking alcohol. Ali did not know whether defendant and the victim had invited anyone to their apartment that evening. The noise that Ali heard sounded to him like two people wrestling, but it could have been more people. Ali added that, after he heard defendant saying "Talal, Talal," he heard "somebody dragging like a leg or

something" on the floor and somebody walking. Ali testified that the shower had a glazed-glass door and he could tell if someone was taking a shower. However, he admitted that he could not observe the bathroom sink from the back door.

¶ 24        David Ryan testified that he recently retired from the Chicago Police Department but that he had been the forensic investigator who examined defendant's apartment after the homicide. Ryan arrived on the scene at 5:50 a.m. on March 15, 2015, where he observed the victim lying on one of two mattresses in the southeast bedroom. Ryan observed a wound on the victim's hip, a large wound in the victim's midsection, and the victim's bloody shirt. When Ryan moved a suitcase on the floor of the southeast bedroom, he found a steak knife with a 3½-inch handle and a 4-inch blade with blood on the blade. In the same bedroom, Ryan found a second steak knife that was broken in two, with the 4-inch blade broken off the handle. Ryan obtained fingernail scrapings from the victim at the scene. Ryan also observed blood on the lower part of the south wall in the southeast bedroom near the light switch, on the west wall, and on the exterior side of the bedroom door.

¶ 25        Dr. Kristin Escobar, an assistant medical examiner and pathologist, testified that she performed the autopsy on the victim. During the autopsy, she observed injuries to his face, neck, chest, abdomen, and legs. The lower right side of his face and his chest each had a cluster of abrasions, and incised wounds were present on his chest, hip, and legs. The pathologist explained that an incised wound was "a superficial cut" caused by a sharp-edged weapon. There was also a stab wound on the upper right side of the abdomen, which was eight centimeters deep. During the internal examination, she observed that the stab wound resulted in a "sharp force injury to his liver as well as the inferior vena cava and the aorta." The pathologist found, within a reasonable degree of medical and scientific certainty, that the

victim died from the stab wound to his abdomen. She testified that the other wounds that she described were "fresh" from "around the time" of the victim's death. She explained that she was able to determine this because there was hemorrhaging around the wounds, which indicates that the victim was still "alive around the time that these injuries were inflicted." At the conclusion of her direct examination, she testified that she had found, within a reasonable degree of medical and scientific certainty, "that the manner of death was a homicide, meaning that he was killed by another person." On cross-examination, she testified that a knife fight between two people was "a possibility." She also agreed with defense counsel's statement that she had "no way of determining whether or not the victim in this case was in the process of attempting to attack somebody else." In response to a question by the court, she opined that, with this type of injury, a person would live only a couple of minutes.

¶ 26    Officer Anthony Acevez, the arresting officer, testified that on March 17, 2015, in the early afternoon, he observed defendant on the street with another man in an area with retail stores. Acevez was in plain clothes but was also wearing a police vest with "police" on the back and a gun holster. Acevez was with two other officers who were also in plain clothes. When Acevez first observed defendant on the street, Acevez was sitting in an unmarked vehicle and made eye contact with defendant. Acevez was 10 to 15 feet away from defendant, and the weather was clear. When they made eye contact, defendant immediately began to run, and Acevez chased him on foot. Defendant's companion ran with defendant, and the two men ran for about three-quarters of a block, until Acevez tripped the other man, who then fell into defendant. Both defendant and the other man landed on the ground. Acevez then placed defendant in custody. When defendant was running Acevez observed that defendant "had run out of his shoes." When Acevez arrested defendant, defendant was in his socks, and his shoes

were still on the street at the location where they had first made eye contact. The arrest happened at 1 p.m., two days after the homicide and four blocks from where the homicide occurred.

¶ 27    After Acevez testified, the parties stipulated (1) that certain police officers, if called to testify, would testify that they took photos of defendant and his clothing when he was arrested and (2) that blood stains from defendant's underwear and from a knife blade, as well as swabs from a knife handle, from defendant and from the victim, were inventoried and sent for testing. Margaret Ness, a forensic chemist, if called to testify, would testify that she analyzed the material in this case and found (1) that the blood stain from defendant's underwear was a mixture of at least two people and contained a DNA profile "which matches the DNA profile" of the victim, (2) that the blood stain from the knife blade "matches the DNA profile of [the victim] and does not match the DNA of the defendant," and (3) that the swab obtained from the knife handle contained a mixture of at least two people and contained a DNA profile that "matches the DNA profile of the defendant and does not match the DNA profile of [the victim]." The parties further stipulated that defendant's T-shirt was properly packaged and inventoried but was not submitted for testing. After the stipulations, the State rested.

¶ 28    After the State rested, defense counsel moved for a direct finding. Since this is an issue on appeal, we provide the defense's entire motion and argument below:

> "Judge, at the conclusion of the State's case we'd respectfully ask your Honor to consider a motion for a directed finding. Your Honor has heard the testimony at this point. We wouldn't wish to argue that further."

The trial court denied the motion.

¶ 29　　　　　As part of the defense case, the parties stipulated (1) that, if the assistant medical examiner were recalled, she would testify that she extracted blood from the victim which was submitted to the toxicology unit of her office for drug and alcohol analysis, (2) that if Peter Koin of the toxicology unit were called to testify, he would testify that the victim had a blood alcohol level of .106, which is more than "the legal limit" in the State of Illinois, (3) that, if Megan Ness, the forensic chemist, were called to testify, she would testify that the victim's fingernail scrapings contained a mixture of DNA profiles that were either not suitable for comparison or from which defendant could be excluded, and (4) that Ness would further testify that she was not called upon to analyze other exhibits other than those already described in the parties' stipulations. The defense then rested.

¶ 30　　　　　After listening to closing arguments, the trial court first made credibility findings, stating that it believed Officers Lugo, Acevez, and Ryan; Dr. Alvarenga, the assistant medical examiner; and Ali, the neighbor. After reviewing the evidence and arguments in detail, the court found defendant guilty of first degree murder. The transcript of the sentencing hearing is not in the appellate record; however, defendant does not raise any issues on this appeal regarding his sentence or the sentencing hearing. The mittimus reflects that, on January 25, 2019, the court sentenced defendant to 23 years with IDOC. Defendant's posttrial motion for a new trial was denied on March 1, 2019, and his motion to reconsider sentence was denied on March 18, 2019. Thus, his notice of appeal was timely filed on March 18, 2019, and this appeal followed.

¶ 31                                            ANALYSIS

¶ 32                               I. Pretrial Motion to Suppress

¶ 33          On appeal, defendant claims first that the trial court erred in denying his pretrial motion

to suppress.

¶ 34                                  A. Standard of Review

¶ 35          "The defendant bears the burden of proof at a hearing on a motion to suppress." *People

*v. Gipson*, 203 Ill. 2d 298, 306 (2003); 725 ILCS 5/114-12(b) (West 2018) ("the burden of

proving that the search and seizure were unlawful shall be on the defendant"). "A defendant

must make a *prima facie* case that the evidence was obtained by an illegal search or seizure."

*Gipson*, 203 Ill. 2d at 306-07. "If a defendant makes a *prima facie* case, the State has the burden

of going forward with evidence to counter the defendant's *prima facie* case." *Gipson*, 203 Ill.

2d at 307. "However, the ultimate burden of proof remains with the defendant." *Gipson*, 203

Ill. 2d at 307.

¶ 36          "In reviewing a ruling on a suppression motion, we apply the familiar two-part standard

of review announced by the United States Supreme Court in *Ornelas v. United States*, 517 U.S.

690, 699 (1996)." *People v. Lindsey*, 2020 IL 124289, ¶ 14. "Under that standard, we give

deference to the factual findings of the trial court, and we will reject those findings only if they

are against the manifest weight of the evidence." *Lindsey*, 2020 IL 124289, ¶ 14. "We remain

free, however, to decide the legal effect of those facts, and we review *de novo* the trial court's

ultimate ruling on the motion." *Lindsey*, 2020 IL 124289, ¶ 14.

¶ 37          *De novo* consideration means that a reviewing court performs the same analysis that a

trial judge would perform. *People v. Begay*, 2018 IL App (1st) 150446, ¶ 34. By contrast, a

judgment is against the manifest weight of the evidence " 'only when an opposite conclusion

is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence.' " *People v. Daniel*, 2013 IL App (1st) 111876, ¶ 21 (quoting *Bazydlo v. Volant*, 164 Ill. 2d 207, 215 (1995)). The deferential standard accorded a trial court's factual findings is " 'grounded in the reality that the circuit court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony.' " *Daniel*, 2013 IL App (1st) 111876, ¶ 21 (quoting *People v. Jones*, 215 Ill. 2d 261, 268 (2005)).

¶ 38    "When reviewing the trial court's ruling on a motion to suppress, we may consider evidence both from the trial and the suppression hearing." *People v. Eubanks*, 2019 IL 123525, ¶ 61. In addition, we may affirm the trial court's ruling on a suppression motion "on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct." *Daniel*, 2013 IL App (1st) 111876, ¶ 37.

¶ 39                              B. Fourth Amendment

¶ 40    The fourth amendment to the United States Constitution provides the people with the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. Similarly, the Illinois Constitution of 1970 provides "the right to be secure" against unreasonable searches and seizures. Ill. Const. 1970, art. I, § 6. In addition, through the due process clause of the fourteenth amendment (U.S. Const., amend. XIV), the federal protection of the fourth amendment extends to searches and seizures conducted by the states. *People v. Hill*, 2020 IL 124595, ¶ 19.

¶ 41    "Generally, a search is *per se* unreasonable if conducted without a warrant supported by probable cause and approved by a judge or magistrate." *Hill*, 2020 IL 124595, ¶ 20. However, there are a few "clearly recognized" exceptions to the warrant requirement. *Hill*, 2020 IL 124595, ¶ 20.

¶ 42                                C. Community Caretaking Doctrine

¶ 43        The trial court found the officers' warrantless search of the apartment permissible under the community caretaking exception, which is a well-established exception to the warrant requirement. See *People v. McDonough*, 239 Ill. 2d 260, 268-69 (2010). The phrase "community caretaking refers to a capacity in which the police act when they are performing some task unrelated to the investigation crime, such as *** calls about missing persons or sick neighbors." *McDonough*, 239 Ill. 2d at 269.

¶ 44        The community caretaking exception applies when the following two conditions are satisfied. "First, law enforcement officers must be performing some function other than the investigation of a crime." *McDonough*, 239 Ill. 2d at 272. "In making this determination, a court views the officer's actions objectively." *McDonough*, 239 Ill. 2d at 272. "Second, the search or seizure must be reasonable because it was undertaken to protect the safety of the general public." *McDonough*, 239 Ill. 2d at 272. " 'Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances.' " *McDonough*, 239 Ill. 2d at 272 (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)). "The court must balance a citizen's interest in going about his or her business free from police interference against the public's interest in having police officers perform services in addition to strictly law enforcement." *McDonough*, 239 Ill. 2d at 272.

¶ 45                                D. Emergency Aid Exception

¶ 46        At the pretrial hearing, the State argued that the officer's actions fell "squarely within the emergency aid exception." In its brief on appeal, the State argues that the emergency aid exception is an "example" of the community caretaking doctrine.

¶ 47     Since a reviewing court may affirm a trial court's ruling on a motion to suppress on any basis found in the record (*People v. Bahena*, 2020 IL App (1st) 180197, ¶ 25), it does not matter whether the emergency aid exception is a subset of the community caretaking doctrine or that the trial court did not rely on this exception.

¶ 48     The emergency aid exception allows police to enter and search a home without a warrant in emergency situations. *People v. Lomax*, 2012 IL App (1st) 103016, ¶ 29. The exception involves a two-part test. *Lomax*, 2012 IL App (1st) 103016, ¶ 29. "First, the police must have 'reasonable grounds' to believe there is an emergency at hand; and second, the police must have some reasonable basis, 'approximating probable cause,' associating the emergency with the area to be searched or entered." *Lomax*, 2012 IL App (1st) 103016, ¶ 29 (quoting *People v. Ferral*, 397 Ill. App. 3d 697, 705 (2009)).

¶ 49     "The reasonableness of the officers' beliefs as to the existence of an emergency is determined by the totality of the circumstances known to the officer at the time of entry." *Lomax*, 2012 IL App (1st) 103016, ¶ 29. "[E]mergency situations include instances when someone may be injured or threatened with injury." *Lomax*, 2012 IL App (1st) 103016, ¶ 29.

¶ 50                         1. Belief That an Emergency Exists

¶ 51     In the case at bar, the officers had reasonable grounds to believe an emergency existed. First, the police received a 911 call concerning a battery in progress at defendant's apartment building. " 'A 911 call is one of the most common—and universally recognized—means through which the police and other emergency personnel learn that there is someone in a dangerous situation who urgently needs help.' " *Lomax*, 2012 IL App (1st) 103016, ¶ 31 (quoting *United States v. Richardson*, 208 F.3d 626, 630 (7th Cir. 2000)). Second, this was not an anonymous caller but a call from a neighbor, who was waiting outside to speak to the police

officers, thereby giving them the opportunity to assess his credibility. See *Lomax*, 2012 IL App (1st) 103016, ¶ 58 ("Generally, anonymous tips to the police lack sufficient reliability."). Third, the neighbor had no apparent motive or bias against defendant. Fourth, Officer Lugo testified that the neighbor informed the officers that he had heard a loud verbal argument between two men in Arabic in the apartment upstairs, followed by what sounded like two people wrestling and then one person asking if the apparently injured person was "ok" and begging the injured person to please "get up." Fifth, finding the neighbor's narrative credible, the police knocked on defendant's door in the middle of the night, not once but twice. Sixth, when the officers appeared to be leaving, the neighbor was still adamant that someone was seriously injured. Seventh, defendant failed to answer his door the second time the police knocked, although it was shortly after their first knock. Officer Lugo testified that, instead of leaving, they drove to the back of the building because "[s]omething didn't feel right." *Cf. Lomax*, 2012 IL App (1st) 103016, ¶ 38 ("an unanswered return call is sufficient to create the reasonable belief that an emergency situation exists"). Lastly, after the officers observed that all the gates and doors leading to defendant's apartment were wide open, it was reasonable for them to infer from this fact, coupled with the fact that defendant failed to answer his door a second time, that the person who was injured in the apartment had now been left completely alone. It would have been a dereliction of duty for the officers to have left all alone a person who was, reportedly, injured to the point where he could not stand up and where at least two people were worried if he was "ok"—those two people being defendant and the neighbor. Thus, we find that the facts establish that the police officers had reasonable grounds to believe that an emergency existed. "[R]easonableness 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,' " and the

calculus of reasonableness must allow for the fact that police officers are often forced to make decisions in response to circumstances that are uncertain and rapidly evolving. *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (*per curiam*) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)); *Lomax*, 2012 IL App (1st) 103016, ¶ 40.

¶ 52    Defendant argues that the passage of time in this case argues against finding an emergency, and he cites in support this court's opinion in *Lomax*. In *Lomax*, this court wrote: "Waiting 10 minutes undermines the purpose of the emergency aid exception because in that time, the emergency could pass." *Lomax*, 2012 IL App (1st) 103016, ¶ 35. However, in *Lomax*, we also wrote that "each case is decided by the totality of its own unique facts." *Lomax*, 2012 IL App (1st) 103016, ¶ 37. In *Lomax*, we found it reasonable for the police to act quickly in response to a report of shots being fired, where it was obviously important to act before more shots could be fired. *Lomax*, 2012 IL App (1st) 103016, ¶ 36. By contrast, in the case at bar, the disturbance involved not a firearm, which can injure many in a short space of time, but a physical fight that was apparently over. In the case at bar, the police acted prudently, waiting to enter until they had reasonable grounds to believe that the injured person had been abandoned and left alone.

¶ 53    Defendant argues that the following testimony establishes that the officers did not believe there was an emergency. Officer Lugo testified that, after knocking on defendant's door the first time and speaking with defendant, he was satisfied that he "had done [his] job" and he told the neighbor that he was satisfied that everything was okay. However, the neighbor was still concerned, and it was the neighbor's concern that caused the officers to reconsider and return and knock a second time. The second time, the officers knocked for a period of time and received no response. Again, they told the neighbor that they were satisfied that nothing

was wrong, and they exited the building, returned to their police vehicle, and punched in a code indicating their assignment was complete. Defendant argues to this court, as he did to the trial court, that this testimony establishes that the police did not believe there was an emergency.

¶ 54    In response to this argument, the trial court found: "The fact that the police tell Ali that they were satisfied is not fact—is not, I should say proof that, in fact, they did think everything is okay because clearly they didn't." The trial court found that "[t]he fact that nobody answers the door is something that I don't doubt gave them pause, clearly gave them pause, that's why they *** got in their car and went around to the back." The trial court's factual finding here is well supported by the evidence. The fact that the officers did not depart shows that they had begun to suspect that something was wrong, and in fact, Officer Lugo testified to just that. He testified: "Something didn't feel right." The lack of a response, after five minutes of knocking when the door had been promptly answered just minutes before, combined with the wide-open gates and doors, gave the officers reasonable grounds to believe an injured person had just been abandoned.

¶ 55    Defendant argues that the police had no idea how long the gates and doors had been left open. However, defendant's back apartment door was also "wide open," and the officers had already observed defendant carefully closing the front door after they had finished speaking to him. Thus, we do not find this particular point persuasive as to defendant's theory.

¶ 56                          2. Emergency Associated With the Area

¶ 57    Second, the police must have some reasonable basis, " 'approximating probable cause,' associating the emergency with the area to be searched or entered." *Lomax*, 2012 IL App (1st) 103016, ¶ 29 (quoting *Ferral*, 397 Ill. App. 3d at 705). In the section above, we found reasonable grounds to believe an emergency existed. In this section, we discuss whether that

18

emergency was sufficiently associated with defendant's apartment to justify entering and searching it.

¶ 58     In the case at bar, practically every piece of information that the police officers had associated this emergency with the area to be searched or entered. The events described by the neighbor all occurred in defendant's apartment—the sound of wrestling and the statements asking the apparently injured person if he was "ok." The gates and the doors that were open all led, progressively, to defendant's apartment. The police had every reason to believe that the injured person was still inside defendant's apartment, since defendant, as overheard by the neighbor, had manifested a concern about whether the injured person had even the capacity to stand. Thus, we find that the facts establish that the police had a reasonable basis, approximating probable cause, to associate this emergency with the area to be searched or entered. There was no question here about whether the police had entered the correct apartment. See *Lomax*, 2012 IL App (1st) 103016, ¶ 54.

¶ 59     In sum, we find that the police officer's warrantless entry into defendant's apartment fits squarely within the emergency aid exception.

¶ 60     On appeal, defendant argues that, even if an exception existed that justified the officers' initial entry and search for a victim, the trial court erred by not finding that the police officers' subsequent search exceeded the scope of the emergency aid exception and community caretaking doctrine. Defendant now argues that, after the discovery of the victim's body, the police should have immediately stopped and obtained a warrant before searching further.

¶ 61     However, at the pretrial hearing, the officer was not asked a single question concerning any subsequent search after the discovery of the body, and the defense made no arguments to the trial court that the scope of any such search exceeded any applicable exception. As a result,

the trial court made no finding on this issue. As noted above, the defendant bears the burden of proof at a hearing on a motion to suppress, both the initial burden of going forward and establishing a *prima facie* case and the ultimate burden of proving the grounds for the motion. *Gipson*, 203 Ill. 2d at 306-07. Only if a defendant first establishes a *prima facie* case does the State have the burden of going forward with evidence to rebut the *prima facie* case established by defendant. *Gipson*, 203 Ill. 2d at 307. Where the defense did not introduce any evidence at the pretrial hearing regarding the officers' actions after the discovery of the victim's body and where the defense argued to the trial court about the illegal "entry" but made no arguments regarding the permissible scope of any applicable exceptions, this cannot now be a basis for finding that the trial court erred in denying defendant's pretrial suppression motion.

¶ 62                                  II. Defendant's Flight

¶ 63            Defendant argues that the trial court erred during trial by allowing the admission of certain evidence as evidence of flight. Specifically, defendant argues that the trial court erred by allowing evidence (1) that defendant fled from police when he left his apartment after the police knocked on his door on the day of the murder and (2) that he fled from police on the day of his arrest.

¶ 64            Flight is generally considered some evidence of a guilty mind. *People v. McNeal*, 2019 IL App (1st) 180015, ¶ 83; *People v. Ross*, 2019 IL App (1st) 162341, ¶ 32 ("Defendant's flight from police also demonstrates consciousness of guilt."). In particular, " '[h]eadlong flight' " is one factor, when taken together with others, that may support a finding of criminal activity. *In re D.L.*, 2018 IL App (1st) 171764, ¶ 30 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)). It is well established that flight, when considered with all the other evidence,

20

is a circumstance that a factfinder may consider as tending to prove guilt. *E.g.*, *People v. Trzeciak*, 2014 IL App (1st) 100259-B, ¶ 64.

¶ 65    We review the admission of flight evidence, as we do the admission of other evidence generally, only for an abuse of discretion. *Trzeciak*, 2014 IL App (1st) 100259-B, ¶ 64. An abuse of discretion occurs when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the position adopted by the trial court. *McNeal*, 2019 IL App (1st) 180015, ¶ 28.

¶ 66    In his brief to this court, defendant concedes, as he must, that "[1] there was evidence offered that [defendant] left the apartment after he answered the door for the police the first time on March 15, 2015, and [2] there was evidence that he ran from plain-clothes police on March 17, 2015." However, defendant argues that "there was never any evidence that [defendant] was wanted for the killing of [the victim] or that he knew he was wanted." Therefore, defendant argues that the State failed to impute consciousness of guilt from these actions. In addition, defendant argues that he could have had a general "fear of the police or of a foreign justice system."

¶ 67    Whether an inference of guilt may be drawn from evidence of flight depends on the suspect's knowledge (1) that an offense has been committed and (2) that he or she may be suspected. *Trzeciak*, 2014 IL App (1st) 100259-B, ¶ 64; *People v. Wilcox*, 407 Ill. App. 3d 151, 169 (2010). While evidence that a defendant is aware that he may be a suspect is essential, actual knowledge of a possible arrest is not. *Trzeciak*, 2014 IL App (1st) 100259-B, ¶ 64; *Wilcox*, 407 Ill. App. 3d at 170 (" 'actual knowledge of his possible arrest is not necessary' " (quoting *People v. Lewis*, 165 Ill. 2d 305, 350 (1995))).

¶ 68        First, with respect to the day of the murder itself, both these factors are satisfied. It is reasonable to infer that when the police knocked on defendant's door, the victim was already dead. The medical examiner testified that the victim died from the stab wound and died within a couple of minutes. It is reasonable to infer that the moment when the neighbor heard screaming was also the moment when the victim was stabbed. The neighbor testified that he heard the sounds of wrestling, which were followed by yelling and screaming, and then he heard defendant calling the victim's name and pleading for the victim to stand up. The neighbor testified that, when he knocked on defendant's door a second time, defendant stated that the victim was in the bathroom, when the neighbor could observe that he was not. When the neighbor asked to observe the victim, defendant became mad and told him to "do whatever" and closed the door. In the case at bar, where the victim was stabbed in the abdomen by a knife and died within a couple of minutes, where the evidence establishes that defendant was in the apartment when the stabbing occurred, and where the neighbor testified to defendant's agitated and untruthful response to an inquiry about the victim's well-being, the State has established sufficient evidence from which a trier of fact could reasonably infer defendant's knowledge that an offense had been committed.

¶ 69        The evidence at trial also established that, on the day of the murder, defendant had reason to believe he was a suspect. The police had knocked on his door—twice—in the middle of the night. After defendant spoke with them and told them that everything was okay, the police still returned. While the police may not have known at that moment that a crime had been committed, defendant did. When the police walked away the first time, defendant may have thought that they had believed him. However, when they knocked a second time, for a

solid five minutes, he had to have known that they had begun to have their doubts—which they did.

¶ 70    As a result of their doubts, they did not leave the scene but drove to the back of the building, where they found the doors and gate leading to defendant's apartment wide open. The fact that the garage and back doors—even the apartment door—were open—was indicative of a headlong flight. Thus, the evidence establishes a reasonable inference that defendant was aware, at the moment that he fled the apartment on the day of the murder, that he would be a suspect for this crime.

¶ 71    Defendant argues that the evidence did not establish how long the gates and doors had been left open and, thus, this fact was not necessarily indicative of flight. However, defendant's back apartment door was wide open, and the neighbor had testified that defendant had closed this door after telling the neighbor to "do whatever." In addition, defendant had been present in the apartment minutes before and now was indisputably gone. Thus, it was reasonable to infer that the open gates and doors, including the apartment door, were evidence of a headlong flight.

¶ 72    The second instance of flight occurred immediately after defendant made eye contact with Officer Acevez in a retail shopping area, two days after the homicide and four blocks from where it occurred. Although the officer was in plain clothes and in an unmarked police vehicle, he was also in a police vest. After making eye contact, defendant did not stop running until Officer Acevez tripped defendant's companion, who then fell into defendant, knocking them both down. It was reasonable to infer from these actions that defendant was engaged in headlong flight from the police.

¶ 73    We already established above that the two factors for admission were satisfied. However, defendant argues that, instead of showing a guilty mind about the murder, defendant could have had a general fear of the police or fears about a foreign justice system. First, there is nothing in the record to suggest that defendant was in the United States illegally, as he was here as a student. In contrast, all the evidence indicates that he knew that there was a dead body in his apartment and the police knocked on his door for five minutes, even after he tried to assure them that the victim was okay. Thus, it was reasonable to infer that his headlong flight from the police was in response to the stabbing death of the victim.

¶ 74    For the foregoing reasons, we find that the trial court did not abuse its discretion by admitting evidence of defendant's flight from the police on the day of the murder and again two days later.

¶ 75                           III. Insufficient Evidence

¶ 76    Defendant argues that the State's evidence was insufficient either to prove him guilty beyond a reasonable doubt or to withstand the defense's motion for a directed finding at the close of the State's case-in-chief.

¶ 77    Section 115-4(k) of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-4(k) (West 2018)) governs motions for a directed finding. It provides, in relevant part, with respect to bench trials:

> "When, at the close of the State's evidence or at the close of all the evidence, the evidence is insufficient to support a finding or verdict of guilty the court may and on motion of the defendant shall make a finding ***, enter a judgment of acquittal and discharge the defendant." 725 ILCS 5/115-4(k) (West 2018).

24

¶ 78          When deciding a motion for a directed finding, the trial court determines only whether a reasonable mind could fairly conclude the guilt of the accused beyond a reasonable doubt, while considering the evidence most strongly in the State's favor. *People v. Cazacu*, 373 Ill. App. 3d 465, 473 (2007). " 'In moving for a directed verdict [or finding], the defendant admits the truth of the facts stated in the State's evidence for purposes of the motion.' " *Cazacu*, 373 Ill. App. 3d at 473 (quoting *People v. Kelley*, 338 Ill. App. 3d 273, 277 (2003)). This same standard applies whether the trial is a bench or a jury trial. *Cazacu*, 373 Ill. App. 3d at 473. Since a motion for a directed finding of not guilty presents a question of law, we review the trial court's ruling *de novo*. *Cazacu*, 373 Ill. App. 3d at 473. As we noted above, *de novo* consideration means that a reviewing court performs the same analysis that a trial judge would perform. *Begay*, 2018 IL App (1st) 150446, ¶ 34.

¶ 79          When an appellate court is asked to consider the sufficiency of the evidence after a trial, our function is not to retry the defendant. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011). Instead, we determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Beauchamp*, 241 Ill. 2d at 8. In this determination, we draw all reasonable inferences from the record in favor of the State. *Beauchamp*, 241 Ill. 2d at 8. A reviewing court will not reverse a conviction unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of the defendant's guilt. *Beauchamp*, 241 Ill. 2d at 8. Also, a conviction may generally be sustained on circumstantial evidence alone. *Beauchamp*, 241 Ill. 2d at 9.

¶ 80          In his brief to this court, defendant does not make any separate arguments with respect to his motion for a directed finding. Instead he argues that we should find that the trial court

25

erred in denying his motion "[f]or the reasons stated" in the prior section of his brief that argued that "the [S]tate failed to offer proof beyond a reasonable doubt that [defendant] was guilty of first degree murder." Similarly, before the trial court, defendant did not argue the motion. Thus, we consider together, as he did, the arguments concerning his motion and the sufficiency of the State's evidence.

¶ 81                                    A. *Corpus Delicti*

¶ 82        Defendant argues, first, that the States' evidence was insufficient because it failed to prove that the victim's death was caused by the criminal agency of another person.

¶ 83        "Proof of an offense requires proof of two concepts: first, that a crime occurred, or the *corpus delicti*, and second, that it was committed by the person charged." *People v. Ehlert*, 211 Ill. 2d 192, 202 (2004). "In a prosecution for murder, the *corpus delicti* consists of the fact of death and the fact that death was produced by a criminal agency." *Ehlert*, 211 Ill. 2d at 202-03.

¶ 84        Defendant argues that the State failed to prove that the victim's death was produced by a criminal agency. However, the pathologist testified that she opined, within a reasonable degree of medical and scientific certainty, that the victim died from a stabbing and "that the manner of death was a homicide, meaning that he was killed by another person." This testimony was sufficient to establish the *corpus delicti* for purposes of either a motion for a directed finding or a claim on appeal of insufficient evidence. See *People v. King*, 2020 IL 123926, ¶ 53 (where the pathologist testified that the victim died of strangulation, "this testimony alone," if believed by the factfinder, is "sufficient to permit a rational trier of fact to conclude beyond a reasonable doubt that [the victim's] death was produced by criminal agency").

¶ 85        In his brief to this court, defendant argues that the State's evidence failed to "dispel the notion that [the victim] was in the process of attacking someone else or that he received wounds during a knife fight." In support of this argument, he relies solely on the pathologist's testimony. The pathologist who performed the autopsy testified that she observed injuries to the victim's face, neck, chest, abdomen, and legs. The lower right side of his face and his chest each had a cluster of abrasions, and incised wounds were present on his chest, hip, and legs. The pathologist testified that these nonfatal wounds were "fresh" from "around the time" of the victim's death. She explained that she was able to determine this because there was hemorrhaging around the wounds, which indicates that the victim was still "alive around the time that these injuries were inflicted." In addition, she did not observe any defensive wounds on his hands or forearms. On cross-examination, she testified that a knife fight between two people was "a possibility" and that she had "no way of determining whether or not the victim in this case was in the process of attempting to attack somebody else."

¶ 86        However, there is no evidence in the record that a third person was present in the apartment and no evidence or argument made at either trial or on this appeal that defendant was acting in self-defense or in mutual combat. The pathologist testified that the time span between the fatal stabbing and the resulting death was only two minutes. The neighbor testified that he heard wrestling and then screaming, which, it is reasonable to infer, occurred at the moment of death. This is particularly reasonable to infer, in light of the fact that the neighbor then heard defendant repeating the victim's name and pleading for the victim to stand. When the neighbor knocked on defendant's door, defendant admitted that there had been an argument. The DNA evidence established that the victim's blood was present on defendant's underwear when he was arrested, that blood on a knife blade was from the victim, and that

DNA on the knife's handle was from defendant. If a third person was the culprit, then it would be reasonable to expect an outcry from defendant upon discovery of the offense or the victim's lifeless body. Not only was there no outcry, defendant reassured the police that everything was okay, although the evidence indicates that the victim was already dead when they inquired. In light of all this evidence, where no argument was made at trial or on appeal of either self-defense or mutual combat, and where no evidence existed of a third person being involved, we do not find this argument persuasive.

¶ 87                                  B. DNA Evidence

¶ 88        Defendant argues next that other items in the apartment could have been tested for DNA evidence, that additional testing would have more conclusively established the presence or absence of a possible third person, and that defendant's DNA on items in his own apartment does not prove his guilt.

¶ 89        In the case at bar, the blood stain on defendant's underwear contained the DNA of the victim. The trial court found this evidence "compelling, if not damning," and so do we. In addition, the victim's blood was found on the knife blade, while defendant's DNA was on the handle. Where the victim's blood was found on both defendant and the blade of the apparent murder weapon and where defendant's DNA was found on the weapon's handle, we cannot find that the trial court, as factfinder, was irrational for not inferring that the DNA of a third person would have been found in other locations. A trier of fact is not required to "search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Jackson*, 2020 IL 124112, ¶ 70.

¶ 90        Defendant argues that he could have been wearing the victim's underwear, and there was no proof that the underwear he wore was his own. However, it is reasonable for a factfinder

to infer that the underwear that one is wearing is one's own underwear. "[T]he trier of fact is not required to disregard inferences that flow normally from the evidence before it ***." *Jackson*, 2020 IL 124112, ¶ 70.

¶ 91                                C. Circumstantial Evidence

¶ 92        Lastly, defendant argues that the State's evidence was circumstantial and, thus, created a reasonable doubt of guilt. Defendant argues that there was no confession, no eyewitness, and no evidence of a motive or intent.

¶ 93        First, "[i]t has long been recognized" by our supreme court "that motive is not an essential element of the crime of murder, and the State has no obligation to prove motive in order to sustain a conviction of murder." *People v. Smith*, 141 Ill. 2d 40, 56 (1990).

¶ 94        Second, while there was no "eye" witness, there was an "ear" witness. The neighbor appears to have heard the wrestling before the stabbing, the screaming resulting from the stabbing, and defendant's subsequent pleading for the victim to stand during the two minutes that the pathologist testified it took for the victim to die.

¶ 95        Third, although we do not have an outright confession by defendant, his own words and actions are incriminating. If the victim's death was the result of an accident or the acts of a third person, one would have expected an immediate outcry by defendant to the police and neighbor who knocked on his door. However, what defendant did was just the opposite. Instead of seeking their aid, he sought to assure them that everything was okay and closed the door on their possible assistance.

¶ 96        Fourth, intent may be inferred from the type of injury and the force needed to inflict it. See *People v. Richardson*, 401 Ill. App. 3d 45, 51-52 (2010) (photos of the deceased's injuries were properly admitted to prove intent). In addition, the pathologist testified that she found, to

29

a reasonable degree of medical and scientific certainty, that the victim's death was a homicide. See *King*, 2020 IL 123926, ¶ 53. As already discussed above, flight was evidence of consciousness of guilt, as was defendant's attempted cover-up.

¶ 97    Finally, our supreme court has repeatedly found that circumstantial evidence is sufficient to sustain a murder conviction, so long as, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *King*, 2020 IL 123926, ¶ 52; *Jackson*, 2020 IL 124112, ¶¶ 64, 75.

¶ 98    In the section above discussing the flight evidence, we already detailed the evidence establishing defendant's presence at the scene, his knowledge of the offense, and his flight from the police officers. Nonetheless, we are aware that "[t]he mere presence of a defendant at the scene of the crime is *** insufficient to make a defendant accountable [for it], even if it is coupled with defendant's flight from the scene or defendant's knowledge that a crime has been committed." *People v. Johnson*, 2014 IL App (1st) 122459-B, ¶ 132.

¶ 99    However, in addition to presence, knowledge and flight, there was (1) the DNA evidence, which, as the trial court found, was "damning"; (2) the neighbor's testimony about the wrestling, the screaming, defendant's immediate pleading with the victim to rise, and defendant's subsequent admission of an argument; (3) the attempted cover-up by defendant, where he repeatedly asserted to both police and to a neighbor that everything was okay, although the evidence indicates that the victim was already dead by that time; and (4) a second flight, which showed that the first flight was no coincidence.

¶ 100    In sum, we find that the circumstantial evidence was sufficient for a factfinder to find defendant guilty beyond a reasonable doubt and sufficient to withstand a motion for a directed

finding. "[I]t is not necessary that the trier of fact find each fact in the chain of circumstances beyond a reasonable doubt," so long as the trier of fact finds that the evidence, taken together, supports a finding of defendant's guilt beyond a reasonable doubt. *Jackson*, 2020 IL 124112, ¶ 70. Taken together, the evidence in this case satisfied this standard.

¶ 101                                              CONCLUSION

¶ 102          For the foregoing reasons, we do not find defendant's claims persuasive, and we affirm his conviction and sentence.

¶ 103          Affirmed.

**No. 1-19-0692**

| | |
|---|---|
| **Cite as:** | *People v. Aljohani*, 2021 IL App (1st) 190692 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 15-CR-6105; the Hon. Timothy Joseph Joyce, Judge, presiding. |
| **Attorneys for Appellant:** | Stephen F. Hall, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Iris G. Ferosie, and Shawn M. Concannon, Assistant State's Attorneys, of counsel), for the People. |