2021 IL App (2d) 210071-U
No. 2-21-0071
Order filed December 6, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Boone County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 19-CF-134 |
| BRYAN SANCHEZ, | ) ) ) | Honorable C. Robert Tobin III, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Justices Zenoff and Schostok concurred in the judgment.

**ORDER**

¶ 1     *Held*:  Defendant was properly convicted of aggravated fleeing or attempting to elude a peace officer by driving over 21 miles per hour above the speed limit.  Defendant failed to yield at an intersection where three officers, in full uniform, were positioned to conduct seatbelt checks.  Despite the officers' verbal and visual signals to stop, defendant proceeded through the intersection.  The speed element was satisfied where the officers pursued defendant in their squad cars, reaching a speed of over 100 miles per hour in a 55 miles-per-hour zone, yet were unable to overtake him.

¶ 2     After a jury trial, defendant, Bryan Sanchez, was convicted of aggravated fleeing or attempting to elude a peace officer (625 ILCS 5/11-204.1(a)(1) (West 2018)).  On appeal, he contends that his conviction must be reversed because the State did not prove him guilty beyond a

reasonable doubt. Alternatively, he contends that his conviction must be reduced to simple fleeing or attempting to elude a peace officer (*id.* § 204(a)) because the State did not prove beyond a reasonable doubt that he drove at least 21 miles per hour over the legal limit. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The indictment against defendant alleged that he, as the driver of a motor vehicle, having been given a visual or audible signal by a peace officer, Candy Bunk, directing him to stop, willfully refused to obey the direction and fled from Bunk, and in fleeing from Bunk, drove at least 21 miles per hour over the legal limit.

¶ 5      We summarize the trial evidence. Bunk, a Boone County sheriff's deputy, testified on direct examination as follows. On May 19, 2019, at 5:05 a.m., she was participating in a traffic detail in the Village of Poplar Grove (the Village) at the intersection of Route 173 and Poplar Grove Road with her sergeant, Edward Krieger, and Deputy Michael Schwartz. The officers were checking for compliance with the seatbelt laws. There were two lanes in each direction and four-way-stop signs in all directions. The weather was dry and clear, and it was just beginning to get light out.

¶ 6      Bunk testified that all three officers drove marked squad cars to the intersection and stood outside. Bunk stood on the sidewalk at the southwest corner, in front of the parking lot where her squad car was parked. Krieger stood on the southeast corner of the intersection and Schwartz stood on the northeast corner, across from Bunk. All were in full uniform and wore reflective vests that read "Sheriff" on the front and "Police" on the back. They carried flashlights. On a seatbelt detail, an officer waits until a vehicle is close to the stop and then, if necessary, shines the flashlight into the vehicle. If all the occupants are wearing seatbelts, the officer lets them go on their way.

¶ 7     Bunk testified that, at about 5:05 a.m., a black Hyundai going east on Route 173 stopped at the intersection. The driver was alone. Bunk shined her flashlight into the car through the windshield and saw that he was not wearing a seatbelt. Bunk indicated verbally and with hand motions that the driver was to stop and that she would approach by walking across in front of the vehicle. The driver stopped at the stop sign, then drove through the intersection. He made eye contact with Bunk numerous times while she was shining the flashlight and moving it up and down, but he "just floored it right through that intersection."

¶ 8     Bunk testified that she shouted to Krieger and Schwartz that the driver was not wearing a seatbelt and that she intended to stop the Hyundai. Krieger called out the Hyundai's license plate number. Bunk looked east and saw the Hyundai pass another vehicle in a no-passing zone, going at "a high rate of speed." The three officers drove off in pursuit of the Hyundai, with Schwartz ahead of Bunk and Krieger behind her. All three squad cars were displaying their flashing overhead, front, and back lights.

¶ 9     Bunk testified that the officers followed the Hyundai east toward Capron, slowing down momentarily to negotiate a curve and drive around a car and a motorcycle. "[A]round another curve coming into Capron near Centerville Road," Schwartz advised that he had lost sight of the Hyundai. At that point, Bunk's speedometer was showing 112 miles per hour. The officers called off the pursuit, out of safety concerns. Bunk ran the registration number that Krieger had called out to her, and it came back to defendant. Later, Bunk received an e-mailed photograph of defendant's driver's license, and the photograph matched the driver whom she had seen. In court, Bunk identified defendant as the driver of the Hyundai.

¶ 10    Bunk testified on cross-examination as follows. At 5:05 a.m., her squad car was parked facing west. Schwartz's squad car would have been visible from a vehicle approaching the

intersection and going east. When the Hyundai approached the stop sign, its windows were up. The windows "had a tint to them." As the Hyundai approached, Bunk was standing on the passenger's side of the car but was looking through the windshield. At that point, Bunk would not have been able to tell whether the driver was playing music, wearing earbuds, or on a Bluetooth call. She gave the driver several verbal commands but did not use sound amplification. She repeatedly waved her flashlight up and down and shined it through the windshield.

¶ 11    Bunk testified that defendant made eye contact with her when he stopped and again as he drove through the intersection. She observed the Hyundai passing in the no-passing zone around Carson Drive, which was approximately 600 to 865 feet from the intersection. In cresting the hill just east of Carson Drive, a driver would momentarily lose sight of a vehicle in front of her.

¶ 12    In the remainder of her testimony, Bunk stated that she heard no music coming from the Hyundai when it went through the intersection. The speed limit for Route 173 was 40 miles per hour approaching the intersection with Poplar Grove Road, 45 miles per hour where Krieger had been standing, and 55 miles per hour beyond the Village. She did not see the Hyundai turn off onto any side streets or driveways.

¶ 13    Krieger testified on direct examination as follows. While working on the seatbelt detail, he was in full uniform, including his duty belt, official patches on both sleeves, and a reflective vest. Krieger stood on the southeast corner of the intersection. At some point, he heard Bunk shout, " 'Stop, stop,' "or " 'You need to stop.' " Krieger turned and saw Bunk standing on the southwest corner of the intersection. The Hyundai was starting to go through the intersection. Bunk was yelling at the driver and flashing her flashlight at the car. Krieger shined his flashlight at the car, saw it go by him, looked at the license plate, and continued watching the vehicle as it

went east. He called on the driver to stop. Krieger saw the Hyundai pass another car in a no-passing zone.

¶ 14    Krieger testified that he shouted to Bunk, who was already going to her squad car. They decided to stop the Hyundai. Krieger's marked squad car had flashing red and blue lights on the top, front, and back. Schwartz, followed by Bunk and Krieger, set off after the Hyundai. Krieger's speed reached more than 100 miles per hour during the chase. The speed limit was 45 miles per hour through the Village and 55 miles per hour east of the Village.

¶ 15    Krieger testified on cross-examination that, at the intersection, he stood facing north, about 30 feet south of the intersection. At that time, his squad car's flashing lights were not activated. The first time that he saw the Hyundai was as it went through the intersection, which took only seconds. The officers never stopped the Hyundai or made contact with the driver.

¶ 16    Schwartz testified on direct examination as follows. During the detail, he stood at the northeast corner of the intersection, wearing his full uniform and a reflective vest. As he was looking at westbound traffic, he heard Bunk shout, " 'Stop, stop.' " He turned and saw the Hyundai stop, then continue through the intersection. Schwartz said, " 'Stop,' " and flashed his light at the car. Schwartz got into his marked squad car, turned eastbound on Route 173, and pursued the Hyundai, activating his overhead, front, and back flashing red and blue lights.

¶ 17    Schwartz testified that, after passing two cars and a motorcycle, he came to a curve on Route 173 just east of Beaverton Road. Coming around the corner, he saw "considerably up further taillights come on in the corner." The Hyundai continued at a high speed toward Capron. As Schwartz got to Meier Road, he deactivated his emergency lights, because the vehicle was no longer in sight and, "at the rate of speed [defendant] was going, [Schwartz] probably wouldn't have caught him." At that point, defendant's vehicle was still pulling away.

¶ 18     Schwartz's testimony continued:

> "Q. What speeds did your vehicle—your squad car reach?
>
> A. I was in excess of a hundred miles an hour.
>
> Q. And you were not able to catch that vehicle?
>
> A. I was—I did not.
>
> Q. In your opinion, was that vehicle still pulling away?
>
> A. It was."

¶ 19     Schwartz testified that his squad car had recorded a video of the pursuit. The video was played for the jury.

¶ 20     Schwartz testified on cross-examination that, when he went to his squad car, he briefly lost sight of the Hyundai. Route 173 is flat for a short distance, then dips just east of Carson Drive. Referring to the video that had just been played, defense counsel asked Schwartz, "[T]here are several points where you cannot observe any taillights heading eastbound in front of your squad car; is that correct?" Schwartz answered, "It is until they saw the lights and then activated their brake."

¶ 21     Schwartz testified that there were four or five private drives on Route 173 between Poplar Grove Road and Beaverton Road, plus an entrance to a subdivision to the south. There was a forest preserve to the north. In all, Schwartz drove seven-tenths of a mile in the pursuit. He did not know whether other vehicles entered the eastbound lane after he observed the black Hyundai.

¶ 22     On redirect, Schwartz testified that, during the pursuit, he did not see any eastbound vehicle head into a private drive, enter the forest preserve, or turn onto another roadway. He did not see any taillights in any private drive or the forest preserve or anything to indicate that a vehicle had turned off the roadway.

¶ 23    The jury found defendant guilty.   The trial court sentenced him to 18 months' imprisonment.  He timely appealed.

¶ 24                              II. ANALYSIS

¶ 25    Defendant contends first that the evidence did not prove him guilty beyond a reasonable doubt of aggravated fleeing or eluding, because it did not establish that he acted willfully. Defendant contends second that, even if the State proved willfulness, his conviction must be reduced to simple fleeing or eluding because the State did not prove beyond a reasonable doubt that he exceeded the posted speed limit by at least 21 miles per hour.

¶ 26    When faced with a challenge to the sufficiency of the evidence, we ask whether, after viewing all of the evidence in the light most favorable to the prosecution, any rational factfinder could have found the elements of the offense proved beyond a reasonable doubt.  *People v. Torrance*, 2020 IL App (2d) 180246, ¶ 14.  The fact finder is responsible for determining the witnesses' credibility, weighing their testimony, and deciding on the reasonable inferences to be drawn from the evidence.  *Id.*  It is not our function to retry the defendant.  *Id.*

¶ 27    As pertinent here, fleeing or attempting to elude is defined as follows:

"Any driver or operator of a motor vehicle who, having been given a visual or audible signal by a peace officer directing such driver or operator to bring his vehicle to a stop, wilfully fails or refuses to obey such direction, increases his speed, extinguishes his lights, or otherwise flees or attempts to elude the officer, is guilty of a Class A misdemeanor.  The signal given by the peace officer may be by hand, voice, siren, red or blue light.  Provided, the officer giving such signal shall be in police uniform, and, if driving a vehicle, such vehicle shall display illuminated oscillating, rotating or flashing red or blue lights which

when used in conjunction with an audible horn or siren would indicate the vehicle to be an official police vehicle." 625 ILCS 5/11-204(a) (West 2018).

¶ 28 As charged here, fleeing or attempting to elude is aggravated when "such flight or attempt to elude *** is at a rate of speed at least 21 miles per hour over the legal speed limit." *Id.* § 11-204.1(a)(1).

¶ 29 Defendant contends first that the State failed to prove that he willfully failed or refused to obey Bunk's direction to stop. For the reasons that follow, we disagree.

¶ 30 An act is performed "wilfully" (*id.* § 11-204(a)) if it is performed "knowingly or with knowledge." 720 ILCS 5/4-5 (West 2018). Knowledge is often proved by circumstantial evidence. *People v. Hinton*, 402 Ill. App. 3d 181, 185 (2010).

¶ 31 Defendant acknowledges that Bunk testified that she was in full uniform and wearing a vest identifying her as a sheriff's police deputy. He also acknowledges that she testified that, after shining her flashlight through the windshield, she indicated verbally and with hand motions that defendant was to stop. However, defendant points to other evidence, primarily that, at 5:05 a.m., it was just beginning to get light out; that the windows of the Hyundai were rolled up and tinted; that Bunk could not say whether defendant was playing music, listening to earbuds, or on a Bluetooth call; and that she did not use voice amplification.

¶ 32 Defendant's argument understates the inculpatory evidence that he acknowledges, overstates the weight that the jury should have given the exculpatory evidence, and omits other evidence that he knew what Bunk was ordering but disobeyed her.

¶ 33 The evidence showed not only that Bunk was in full uniform when she ordered defendant to stop but that she was standing near the stop sign that he was approaching—and that two other officers were standing at the same intersection. Moreover, all three were wearing reflective vests,

appropriately marked, and carrying flashlights. Thus, it was a fair inference that defendant knew that the officers were participating in a planned operation that focused on all drivers who would pass through the intersection. Even had it been dark (and the videos showed that it was not), defendant would have been on notice of this much before he stopped at the sign.

¶ 34 More directly pertinent here, the jury could have inferred that Bunk's visual and verbal signals were not overlooked or misinterpreted. The visual signs included Bunk shining the flashlight into the car (not a command to stop but an indication that one could be forthcoming), then making hand motions and waving her flashlight. Again, even had it been dark, defendant could hardly have missed Bunk's flashlight or her reflective vest. Bunk also repeatedly calling on defendant to stop. That Bunk did not use sound amplification did not mean that she could not yell loudly.

¶ 35 Moreover, although defendant does not mention it, the other two officers testified that they also ordered defendant to stop, using visual and verbal signals. They were not far from Bunk, and the jury could conclude that defendant could see and hear at least one of the officers who were working strenuously to get his attention from three different directions. Although defendant suggests that it was not clear whether he had been distracted by music, earbuds, or a Bluetooth conversation at the time, Bunk testified that she did not recall hearing music, and the jury could conclude that even earbuds or a phone conversation would not have blocked out the concerted efforts of the officers to gain his attention.

¶ 36 Further still, there was evidence that defendant was not so distracted. Bunk testified that, when he stopped at the intersection, he made eye contact with her and, as he drove through the intersection, he did so again. Thus, the jury could easily infer that defendant had been aware of what Bunk, at the very least, was doing during and after his drive through the intersection.

¶ 37    Finally, defendant's conduct after he drove through the intersection strongly supported the inference that he did so knowing that he was defying an order to stop. Defendant had been observed violating the seatbelt law. He did not respond to the officers' repeated signals by stopping or in any way acknowledging that he had made an oversight. Instead, he kept driving and, when the officers pursued him, he sped up to stay ahead of them. Moreover, he passed another vehicle in a no-passing zone. These actions were inconsistent with an innocent mistake. Even more so was defendant's decision to lead the officers on a chase for a substantial distance. Flight is "generally considered some evidence of a guilty mind." *People v. Aljohani*, 2021 IL App (1st) 190692, ¶ 64.

¶ 38    We hold that the evidence was sufficient to prove that defendant acted willfully. Therefore, we reject his argument that his conviction must be reversed outright.

¶ 39    Defendant alternatively contends that the State did not prove beyond a reasonable doubt that, in fleeing or eluding the police, he drove at least 21 miles per hour over the legal limit. Defendant notes that the officers did not use radar, time him with a stopwatch, or pace his car. He also notes that there was no evidence of how much of a head start he had on the officers, who spoke with each other, walked to their squad cars, and started their cars before pursuing defendant.

¶ 40    Defendant also argues that there was no evidence that the squad cars' speedometers had been tested for accuracy. However, he never raised this matter at trial. Generally, to preserve an issue on review, a party must raise it in the trial court. *People v. Brown*, 319 Ill. App. 3d 89, 96 (2001). Objections based on foundational requirements are particularly critical because usually such errors can be cured easily. *People v. Rigsby*, 383 Ill. App. 3d 818, 823 (2008). Thus, the jury was entitled to consider the officers' testimony about their speeds, and that testimony must be considered in assessing the sufficiency of the evidence. We turn to that assessment.

¶ 41      All three officers testified that they reached speeds of 100 miles per hour or more even though the speed limit for Route 173 was no more than 55 miles per hour.  Moreover, despite the length of the chase, both in time and ground covered, they did not catch up to defendant and apparently made so little progress toward that goal that they called off the pursuit.  It was a fair inference from Schwartz's testimony that, near the end of his effort, he was driving more than 100 miles per hour, yet defendant was still pulling away.  Although defendant notes several respects in which the State's evidence might have been stronger, the issue is whether the evidence that the State did present was sufficient to allow the jury to find that, at some point, defendant drove more than 21 miles per hour. over the legal speed limit.  Given the officers' consistent testimony, we hold that the evidence was sufficient.

¶ 42      The parties cite several opinions as support for their respective positions on the speed issue. However, cases such as this one are always fact-specific, and thus we find these authorities provide little guidance to our analysis in this case.

¶ 43                                    III. CONCLUSION

¶ 44      For the reasons stated, we affirm the judgment of the circuit court of Boone County.

¶ 45      Affirmed.